Tyrone Leroy FULLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 70881.

Court of Criminal Appeals of Texas,
En Banc.

March 25, 1992.

Carol Hammond, Webb Biard, Judy Hodgkiss, Paris, for appellant.

Tom Wells, City Atty. and Kerye Ashmore, Asst. City Atty., Paris, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

OVERSTREET, Judge.

In March of 1989, appellant was convicted, in the 59th District Court of Grayson County, Texas, after a change of venue from Lamar County, of capital murder pursuant to TEX.PENAL CODE ANN. § 19.-03(a)(2) (Vernon Supp.1988). The indictment alleged in separate paragraphs that the murder was committed on or about January 20, 1988, during the course of committing or attempting to commit burglary of a habitation, robbery, and aggravated sexual assault.[1] After the jury returned affirmative findings to the special issues submitted pursuant to TEX.CODE CRIM. PROC.ANN. art. 37.071 (Vernon Supp. 1989), the trial judge assessed punishment at death. On direct appeal, appellant raises a total of twelve points of error (eleven in his original brief plus one additional in a supplemental brief).

### I.

## SUMMARY OF PERTINENT FACTS

The testimony and evidence introduced at trial, including appellant's grand jury testimony[2] and multiple written statements, indicate that on the morning of January 20, 1988, the complainant was found dead outside the Paris, Texas apartment which she shared with her sister. She had been beaten, stabbed several times, and sexually as-

---

1. The burglary, in two separate paragraphs, was alleged to have been committed with the intent to commit theft of credit cards and with the intent to commit sexual assault. Another separate paragraph alleged burglary with the intent to commit theft but without specifying particular property.

2. We observe that the transcript of the grand jury testimony does not appear to have ever been formally admitted into evidence. When the State offered the exhibit, which was described as such a transcription, appellant's objection was overruled. However, the State then proceeded to read from the transcript without ever offering it into evidence. We notice that that marked exhibit is not included within the record.

saulted. A subsequent inventory of the house revealed several articles missing including credit cards, some of which were in the complainant's name and some of which were in the name of each of her parents, videocassette tapes, and jewelry. The credit cards were thereafter used to make purchases at various stores. The complainant's car was also missing. Fingerprint and handwriting analysis testimony, along with eyewitnesses, connected appellant with the possession and use of those cards and the car. Bloody sock prints found inside the apartment were later found to be consistent with inked sock impression exemplars taken from appellant. DNA comparison evidence was also introduced to connect appellant to the sexual assault. Appellant's several written statements and grand jury testimony admitted various degrees of involvement in the offense.

## II.

### JURY SELECTION

Appellant's points of error numbers eight and nine complain of challenges for cause granted to the State at jury selection. Point eight avers such error in violation of the United States and Texas Constitutions and Article 1.05 of the Texas Code of Criminal Procedure. Appellant alleges that the veniremember in question was excused because he indicated a lack of acceptance of and had a problem with the death penalty.

■ The record reflects that the veniremember in question initially confirmed that he had indicated on his juror questionnaire form that he did not believe in the death penalty and felt that "only God should decide life." We observe that on the form the statement, "I could never, under any circumstances, return a verdict which resulted in the death penalty[,]" was circled while the statement, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it, if I believed that the facts warranted it[,]" was scratched out.[3]

In response to questioning from both parties, the veniremember consistently indicated severe reservations about the prospect of being involved in the assessment of death. On one occasion, he explicitly stated that he would "have a hard time accepting the death penalty as a viable answer for crime[,]" and "would be more or less determined to vote [']no['] for the life sentence." He then indicated that he could not ever bring himself to answer the special issue questions "yes" knowing that it would result in the imposition of the death penalty. However, he did later indicate that he could answer both questions "yes" if he found that the evidence called for such an answer. When informed that he seemed to have changed his position, the veniremember stated, "The only thing that I understand as we are talking is that we are talking about these particular questions here[,]" and that he "would have no particular problem in assessing guilt/innocence." The trial court then reminded him that they were discussing punishment. The veniremember then stated, "I am still opposed to the death penalty and that doesn't go away no matter how it's stated." He immediately repeated, "I am still opposed to the death penalty." Then, when explicitly asked if he could ever answer the special issue questions "yes" knowing that the death penalty would be the result, the veniremember answered that he could not because he "already knew what the result would be." The trial court asked him if he was going to stick with that, whereupon the veniremember responded, "I will stick with that." The State then immediately challenged that veniremember for cause, whereupon the trial court granted said challenge. Appellant then objected, noting his "exception to th[at] challenge" stating that he "d[id] not think it's proper."

3. Also scratched out on the form were the following statements: "I believe that the death penalty is appropriate in all murder cases[,]" and "I believe that the death penalty is appropriate in some murder cases."

■ The proper standard to be used in disqualifying a prospective juror in death penalty cases is whether that juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1985); *Moody v. State,* 827 S.W.2d 875, 888 (Tex. Cr.App.1992); *DeBlanc v. State,* 799 S.W.2d 701, 716 (Tex.Cr.App.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); *Montoya v. State,* 810 S.W.2d 160, 169 (Tex.Cr.App.1989), *cert. denied,* — U.S. —, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991). On appeal we recognize that great deference must be given to the trial court who is in the best position to see and hear the prospective jurors and to evaluate their responses, thus we will reverse a trial court's ruling only when the record shows a clear abuse of discretion on the trial court's part. *Moody, supra,* 827 S.W.2d at 889; *Davis v. State,* 782 S.W.2d 211, 216 (Tex.Cr.App.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). Based upon the veniremember in question's responses, there was certainly no abuse of discretion in granting the State's challenge for cause. We therefore overrule point of error number eight.

■ Point number nine avers error in the trial court's granting of another State's challenge for cause to a veniremember "on the basis of bias [when] no sufficient bias or impartiality was exhibited to support such an excusal." Apparently because his wife was a former clinical psycholigist and was at the time of the questioning a psychology teacher, that particular veniremember was questioned about the feasibility of a psychologist or psychiatrist determining future dangerousness. He mentioned that he and his wife had on one occasion casually discussed a newspaper article about "a psychiatrist who has a

reputation of being someone who makes cases for prosecutors." He then indicated that he did not have an opinion about that particular doctor, though he later said that he had "kind of a negative opinion," though such was based on what he had read on that single occasion and he did not know whether what he had read was even true. He also indicated that he did not think that he had ever heard of Dr. James Grigson, who was expected to testify for the State in the instant cause, and did not know if he was the doctor referred to in the article. The State eventually challenged the veniremember for cause "based on the fact that he could not consider the testimony of Dr. Grigson as he would any other person in that the article and discussions that he and his wife ha[d] had concerning Dr. Grigson would require him to put a different consideration and weight on that testimony." There was further questioning by the State and appellant regarding the veniremember's ability to consider the testimony of Dr. Grigson. Finally, the trial court sustained the State's challenge. The veniremember was thereupon excused. The record does not reflect an objection, or any other comment, by appellant regarding the excusal at that time.

■ After that veniremember was excused, a new veniremember was called and questioning of him began and proceeded to a lunch recess. The record reflects that it was only after everyone had returned from lunch that appellant objected to the above-discussed challenge for cause. As this Court stated in *Purtell v. State,* 761 S.W.2d 360, 365 (Tex.Cr.App.1988), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989), an objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it; and additionally, the objection should afford opposing counsel an opportunity to remove the objection or supply other testimony.[4] Appellant's objection after

---

**4.** It is well-settled that Tex.R.App.Pro. 52(a)'s requirement of a timely specific objection serves the purpose of allowing the trial court to have

the opportunity to make a determination and ruling on the complained of point and then to proceed with the trial under the proper proce-

the veniremember in question had already been excused and questioning of the next veniremember had begun was far too late to meet the above-noted requirements.[5] Because appellant's belated objection was untimely we overrule point of error number nine.

## III. EVIDENCE AT GUILT/INNOCENCE

### A. Evidence Admissibility

Points of error numbers one, two, three, four, five, and ten allege errors at guilt/innocence. Point number ten avers error in the trial court overruling appellant's motion for mistrial as to a nonresponsive answer from a police officer which implied that appellant had previously been convicted of a felony. The record reflects that during the State's direct examination of one of the investigating detectives there was questioning about various notations and signatures made on an exhibit which was a *Miranda* warning form which had been read to appellant prior to being questioned. The following colloquy took place:

[PROSECUTOR]: Underneath that it says education. There is a spot for grade school, middle school, high school. There is the number 12 filled in and off to the side it says obtained GED with high school grade and two years college.

[WITNESS]: Yes, sir.

[PROSECUTOR]: Who made that notation?

[WITNESS]: I made the notation, "obtained GED at TDC with high school—."

[APPELLANT'S ATTORNEY]: Your Honor, at this time the defendant would ask the court to instruct the jury to

disregard that statement and ask the court to declare a mistrial.

THE COURT: Overruled.

Questioning proceeded and there was no further mentioning of the TDC notation during the testimony. Other witnesses were then called and examined prior to recessing for the day. The next day, while waiting for the arrival of one of the jurors in the morning, appellant reurged his motion for mistrial based upon the above-described comment mentioning TDC from the previous day's testimony. Appellant argued that the comment informed the jury that he had been in prison before, and thus had been convicted of a prior felony. Appellant then reurged his motion to instruct the jury to disregard the comment. The trial court did not recall any motion to instruct, though it did remember the motion for mistrial. After further discussion, the trial court agreed to orally instruct the jury to disregard the TDC comment and to include such a written instruction in the jury charge. That seemed to satisfy appellant because his response to that was, "That's fine, Your Honor." The trial court then said, "All right. The court will give that instruction verbally to the jury when they are brought into the courtroom this morning and it will be repeated and incorporated into the court's written charge." Appellant's only other response was, "Thank you, Your Honor." The jury was then reassembled and after informing the jury that the tardy juror had apologized, the following instruction was orally given:

Members of the jury, you are instructed that you must not speculate on or discuss or consider whether the defendant in this case has been previously convicted of any crime as any such conviction, if any,

dural and substantive manners, as appropriately corrected by the trial court. *Janecka v. State,* 823 S.W.2d 232 (Tex.Cr.App.1990).

**5.** We note that in *Barefield v. State,* 784 S.W.2d 38, 41 (Tex.Cr.App.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990), this Court stated that in the voir dire context, objecting before the veniremember was dismissed and

prior to the questioning of the next veniremember was sufficiently timely to preserve the issue for review. We conclude that an objection made after the challenged veniremember has been excused and the next veniremember has begun to be questioned, as was appellant's in the instant cause, is not timely and thus does not preserve the issue for review.

would have no bearing whatsoever on the guilt or innocent [sic] of the defendant in this case.

The trial then proceeded. A virtually identical written instruction was included in the jury charge.

■■■ Appellant now argues that the admission of the improper comment about TDC was not cured by the trial court's instructions because such were not done promptly when the comment was made. Obviously, reference by a witness to a defendant's prior incarceration in the penitentiary, formerly known as the Texas Department of Corrections and oftentimes colloquially referred to as "TDC," is improper because it violates the longstanding general rule which prohibits the introduction of collateral offenses and transactions. *Tennard v. State*, 802 S.W.2d 678, 685 (Tex.Cr. App.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991); Tex. R.Crim.Evid. 404(b). Nevertheless, this Court has held that generally a prompt instruction to disregard cures the error. *Tennard*, 802 S.W.2d at 685; *Barney v. State*, 698 S.W.2d 114, 125 (Tex.Cr.App. 1985). However, the trial court's instructions in the instant cause were certainly not prompt. Thus, the instruction in and of itself did not cure the error.

■■■ The State makes a claim that appellant did not preserve his claim of error in that he failed to specifically object, ask for an instruction to disregard, then move for mistrial. Though this Court has stated that taking the State's above-listed three steps is necessary to preserve error, and some courts have somewhat dogmatically required that those steps be taken in precise order, the most important procedure is to press the specific objection to the point of obtaining an adverse ruling, be that to the objection, the request for an instruction, or the motion for mistrial. If the

objection is overruled, an adverse ruling is immediately obtained. *Moncrief v. State*, 707 S.W.2d 630, 637 (Tex.Cr.App.1986). It has even been held that a request for a mistrial, which was overruled, followed by a granted request for an instruction to disregard was a method deemed sufficient to preserve the claim of error. *See Coe v. State*, 683 S.W.2d 431, 436 (Tex.Cr.App. 1984).

■■■ In the instant cause, as soon as the improper comment was made appellant immediately requested that an instruction to disregard be given and that a mistrial be declared. The trial court overruled said requests, thus appellant received an adverse ruling. We therefore conclude that appellant has preserved his claim of error.[6] As we have previously concluded that the comment about TDC was improper and erroneous, we must now determine whether such was harmless per Tex.R.App.Proc. 81(b)(2).

■■■ Rule 81(b)(2) mandates that we reverse the judgment under review unless we determine beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. Because evidence of any prior sentences to TDC would be admissible at punishment, we easily conclude beyond a reasonable doubt that the comment made no contribution to the punishment. Determining whether such contributed to the conviction entails more analysis.

■■■ In *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1990), we articulated a coherent standard for determining when an error is harmless. Without reiterating the entire analytical procedure, suffice it to say that we must examine whether the trial was an essentially fair one and determine if the error was of a magnitude that it disrupted the juror's orderly evaluation of the

---

**6.** We do observe that during the next morning's discussions in which the trial court agreed to submit oral and written instructions, the trial court did not rule upon appellant's reurged motion for mistrial. However, the first thing transcribed in the statement of facts after the examination of several witnesses that day and returning from the noon recess was the trial court stating that it "does overrule [appellant's] motion for mistrial."

evidence. *Id.* at 588. After conducting the analysis delineated in *Harris,* we conclude that the single above-described nonresponsive answer mentioning TDC was harmless error.[7] We therefore overrule point number ten.

Point three alleges that "[t]he trial court committed reversible error in admitting into evidence appellant's grand jury testimony." Appellant testified before a grand jury regarding the facts of the instant offense. At trial on the merits, the State, over objection, read a portion of the transcription of that testimony to the jury. That testimony admitted direct participation in burglarizing the complainant. Appellant now claims that the challenged testimony was improper and inadmissible for three reasons: 1) the State failed to properly warn him of his rights pursuant to Article 38.22 of the Texas Code of Criminal Procedure; 2) the State should have ceased all questioning when he notified the prosecutor that he desired his lawyer to be present; and 3) his grand jury testimony was only admissible to impeach and that since he did not testify there was nothing to impeach.

Appellant filed pretrial a "Motion to Suppress Defendant's Statement Pursuant to Jackson v. Denno," then several months later a "First Amended Motion to Suppress Defendant's Statement Pursuant to Jackson v. Denno." A pretrial hearing was then held on the amended motion, with the trial court noting in its findings of fact and conclusions of law that the amended motion was the only suppression motion before it. It also noted that "[t]here [was] no motion to suppress ... [appellant's] grand jury testimony." We observe that neither the original nor the amended motion to suppress made any reference to appellant's grand jury testimony.[8]

Three weeks after the trial court's findings and conclusions and ruling on the amended suppression motion were made, appellant did file a "Motion to Suppress Grand Jury Transcript." The stated bases for such suppression were that "[s]aid evidence is not admissible unless the [d]efendant testifies, and it is used for impeachment purposes[,]" and "Article 38.22 of the Code of Criminal Procedure does not provide for introduction of [g]rand [j]ury testimony into evidence at the on [sic] State's case-in-chief." An evidentiary hearing on that motion does not appear to have been held. The statement of facts does reflect that approximately four weeks later, immediately after the second alternate juror had been selected, appellant brought it to the trial court's attention that there was "still a defense motion before the court concerning the admissibility of the grand jury[;]" i.e., "a motion to suppress, ..., the grand jury testimony of the defendant." The trial court then stated, "The motion to suppress will be denied and the defendant given his exception to the ruling of the court." At trial before the jury, when the State offered the transcription of appellant's grand jury testimony, appellant objected "pursuant to the motion that the court

---

7. *See Williams v. State,* 643 S.W.2d 136, 138 (Tex.Cr.App.1982), where this Court concluded that a partially unresponsive answer mentioning that the accused had been sent to the penitentiary was highly improper and not cured by an instruction to disregard; but nevertheless held that such error was not reversible because of "the harmless error doctrine of law."

8. The motions appear to challenge custodial interrogation by the police which resulted in four written statements. The trial court's findings indicate that it did suppress one of those statements. The record reflects that at the conclusion of oral testimony at the hearing, the trial court informed appellant that it was not limiting him to what he had already sought to sup-

press, and that it would reserve ruling on the matters presented in the motion, but advised that other matters that he wanted suppressed needed to be addressed in specific motions. The trial court then suggested that if the appellant desired to make such specific motions that such be filed before a particular day in the next week. Though the grand jury testimony was admitted into evidence before the trial court at that hearing, the record does not indicate that any motion attacking its admissibility was filed by the designated day. Subsequently, the trial court entered the findings and conclusions, which included the above-described express holding that there was no motion to suppress the grand jury testimony.

ha[d] heard previously." That objection was overruled and the State proceeded to read into evidence portions of the transcript.

■ We note that appellant's objection at trial referred to his motion, which corresponds to his third reason in point of error number three, i.e. that his grand jury testimony was inadmissible because he did not testify and there was nothing to impeach. Because the other two reasons in point three do not correspond with the objection at trial, they are not preserved for review and are thus waived. *Thomas v. State*, 723 S.W.2d 696, 700 (Tex.Cr.App.1986); *Paster v. State*, 701 S.W.2d 843, 846 (Tex.Cr.App. 1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *Gauldin v. State*, 683 S.W.2d 411, 413 (Tex.Cr.App. 1984). We therefore proceed to discuss his claim that the challenged evidence was only admissible to impeach.

■ Appellant claims that "[t]he [l]egislative history of Section [sic] 38.22 Section 5 of [the] Texas Code of Criminal Procedure is replete with the legislature's intention that absent the safeguards of Section 3 an oral statement is only admissible to impeach [a]ppellant." After reviewing the statements made by legislators during hearings on amending Article 38.22 which appellant sets forth in his brief, we discern no such intention.

■ The above-mentioned Section 5 states, among other things, that "[n]othing in [Article 38.22] precludes the admission of a statement made by the accused ... before a grand jury...." The language in Section 5 about "ha[ving] a bearing upon the credibility of the accused as a witness," clearly refers to the admissibility of "a voluntary statement, whether or not the result of custodial interrogation," rather than a statement before a grand jury. It is

a long-standing principle that the voluntary sworn confession of an accused before a grand jury is admissible at trial. *Medlock v. State*, 108 Tx.Cr. 274, 1 S.W.2d 308, 311 (1927); *Crosslin v. State*, 90 Tx.Cr. 467, 235 S.W. 905, 908 (1921); *Webb v. State*, 86 Tx.Cr. 337, 216 S.W. 865, 866 (1919). We therefore hold that there was no error in admitting the complained of grand jury testimony and overrule point of error number three.

### B. DNA Evidence

Points of error numbers one and two address the admissibility of DNA evidence. Point one avers that the trial court "erred in allowing the results of DNA testing to be admitted into evidence[,]" while point two alleges error in disallowing appellant to present evidence from a particular expert "regarding surveys conducted on crime lab directors and forensic scientists as to the reliability of DNA testing."

In January and continuing into February of 1989, the trial court conducted a pretrial hearing to determine "the admissibility of certain evidence relating to genetic code testing which the State propose[d] to offer at the trial." [9] Six expert witnesses testified, four of which were called by the State while two were called by appellant. After the second day's testimony was concluded, the trial court stated, "Well, we have a question of course of what this court is going to consider at this time and what is going to be admissible before a jury, and I am going to reserve ruling on those matters until I have ruled on all of the evidence before me, so they are taken under advisement." The court had previously sustained the State's objection to the expert testimony and exhibits which are the subject of point of error number two but had allowed appellant to proceed with the questioning of that witness and tender the exhibits so

---

**9.** Appellant's written "Motion to Suppress Evidence and Testimony Regarding DNA Testing and Results of Such Testing" urged the trial court to adopt the *Frye* test and hold that DNA testing had not gained general acceptance in the scientific community. In the alternative it urged suppression based upon the evidence and testimony not being relevant and probative and that the prejudicial value would far outweigh any probative value.

that "[they] c[ould] make [their] record on it." The State received a running objection to "all testimony based on th[ose] exhibits" and "any conclusions or opinions that [the expert witness] m[ight] express."

Subsequently when the "so[-]called *Frye* hearing" resumed several days later and testimony was concluded, the trial court stated for the record, "[P]robably the court will announce its decision that the Motion to Suppress the DNA Evidence will be denied and we will have that in the record." After discussing other matters, appellant asked if the trial court had made a decision as to the admissability of the previously offered exhibits and testimony of the expert who is the subject of point of error number two. The trial court responded, "Yes, the court receives that evidence and considers that evidence in ruling on the State's DNA evidence." Thus, it would seem that the trial court changed its mind about that proffered evidence and in effect overruled the State's previously granted objection to that evidence. Therefore, as the trial court stated, that evidence was received and considered.

A few days later, right before individual questioning of the first prospective juror began, the trial court read into the record that it did not expect to make findings of fact and conclusions of law concerning the pre-trial *Frye* hearing but that it could change its mind. It also stated that "the court w[ould] rule that [the expert who is the subject of point of error number two]'s testimony relative to certain surveys made of forensic laboratories and microbiology laboratories w[ould] not be admissable before the jury, to which the defendant duly and timely excepts as [then] noted by the court." Thus it would seem that the trial

court appeared to make something of a ruling suppressing appellant's proffered evidence which was not even the subject of the motion to suppress the State's DNA evidence.

Because the trial court did eventually receive and consider the evidence complained of in point of error number two, as described above, obviously appellant is claiming error in disallowing this evidence at the trial on the merits. However, we are unable to locate any point in the record in which appellant offered such evidence. Appellant's brief does not point out any such location or even aver that he made such an offer. The State claims that that evidence was never offered at trial. We agree. (In fact the record reveals that appellant rested without presenting any evidence at guilt/innocence.) We are therefore unable to discern when or if appellant ever desired that such evidence be presented to the jury. Though admittedly he may have been in something of a quandary, with the trial court announcing that it had seemingly decided that certain evidence was not going to be admissible prior to it even being offered, such did not absolve appellant of the responsibility to at least offer the evidence at some point during the trial on the merits if he wanted it presented before the jury. Because appellant never sought to introduce the evidence at trial, the trial court did not ever exclude it therefrom. We thus conclude that appellant's complaint about not being allowed to present that evidence was not preserved for review and has no merit.[10] Point number two is hereby overruled.

Turning to point number one, as stated above, six experts testified at the pretrial

---

10. We conclude that this rather unusual situation is akin to a case where a motion in limine is granted and an offer of the evidence which was the subject of the motion must be made at trial to preserve a claim of improper exclusion. *See, Basham v. State,* 608 S.W.2d 677, 679 (Tex. Cr.App.1980) and *Norman v. State,* 523 S.W.2d 669, 671 (Tex.Cr.App.1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975). As noted in *Norman, supra,* a trial court's ruling on such a motion is subject to reconsideration throughout the course of the trial. This is of particular interest in the instant cause in that the trial court apparently reconsidered his ruling sustaining the State's objection to appellant's proffered evidence at the suppression hearing yet later announced that it received and considered such evidence in making its ruling on the motion.

hearing. The record reveals that these experts testified in great detail about the theory and process of DNA testing and comparison-making (including quality control) and as to the particulars used with the evidence which appellant sought to prevent the State from introducing. There was specific testimony that the procedures used on that evidence were accepted by molecular biologists and geneticists. The State also introduced articles from various scholarly publications. Appellant presented expert testimony casting some aspersions upon the State's experts' opinions, particularly with regard to quality control and the overall reliability of the tests when the individual procedures were put together as a whole. This included specific testimony which opined that the technique used in the analysis of the evidence in question was not reliable or generally accepted by the scientific community, in part because such technique was only used by one laboratory, at least in a forensic setting.[11] Appellant also introduced evidence (including that which was the subject of the above-discussed point of error number two) dealing with the results and interpretation of opinion surveys of crime lab directors and microbiologists. Appellant's motion to suppress was overruled in the previously-described manner.

■ At the trial on the merits, the State presented testimony from three of the four experts whom it had offered at the pretrial hearing, plus additional testimony from another forensic serologist. They testified about such things as blood groups, enzyme markers, genetic material, alpha genes, polymerase chain reaction, alleles, and degraded DNA. Tests were made from semen stains and pubic hairs found at the scene of the offense plus vaginal swabs made from the decedent. Comparisons were made with those items and various samples taken from other people, including the decedent, her boyfriend, and the three

co-defendants. Testimony indicated that the comparison results excluded all of the above from having deposited the semen and certain pubic hairs except for appellant. Suffice it to say that this evidence and the expert interpretation thereof implicated appellant in sexually assaulting the decedent. When that evidence was offered at trial, appellant did not specifically object to very much of it. However, it is settled that when a pre-trial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error. *Livingston v. State*, 739 S.W.2d 311, 335 (Tex.Cr.App.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Thus appellant has preserved his complaint as to evidence admissibility.

■ We have recently articulated a coherent standard governing admissibility of novel scientific evidence, such as DNA testing. Pursuant to Rule 702 of the Texas Rules of Criminal Evidence, the proponent of such evidence must prove to the trial court, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is relevant; whereupon such is admissible before the jury unless the trial court determines that the probative value of the evidence is outweighed per Rule 403. *Kelly v. State*, 824 S.W.2d 568 (Tex.Cr.App.1992). After reviewing the record and considering this standard we conclude that there was no abuse of discretion or error in "allowing the results of DNA testing to be admitted into evidence" at trial. We therefore overrule point number one.

## C. Evidence Sufficiency

■ Points of error numbers four and five allege insufficient evidence of guilt. Point four specifically avers that "without the DNA evidence, the evidence is insufficient to sustain the jury's verdict of guilty

11. We note that appellant also pointed out that one of the State's exhibits, which was a table summary of some of the testing results, indicated that "hair from victim's clothing" had been "previously mislabeled[.]"

of capital murder." Point five claims that "even with the DNA evidence, the evidence is insufficient to sustain the jury's verdict of guilty of capital murder since this was a circumstantial evidence case." It is well-settled that in reviewing evidence sufficiency claims, the appellate court must consider all of the evidence presented, whether properly or improperly admitted. *Nickerson v. State,* 810 S.W.2d 398, 400 (Tex.Cr.App. 1991); *Chambers v. State,* 805 S.W.2d 459, 460 (Tex.Cr.App.1991); *Dunn v. State,* 721 S.W.2d 325, 327 (Tex.Cr.App.1986). Thus we cannot review evidence sufficiency without considering the DNA evidence as appellant asks us to do in point four. We therefore overrule point four and go on to consider appellant's sufficiency claim in point number five.

As mentioned earlier, point five claims insufficient evidence of guilt. Specifically, appellant alleges that the circumstantial evidence does not exclude the reasonable hypothesis that he may have indeed taken part in sexually assaulting the decedent but took no part in stabbing or killing her. Thus, appellant is attacking the sufficiency of evidence that he took part in the decedent's murder. Because murder was an essential element of all of the various paragraph allegations which were submitted to the jury, appellant is in effect attacking the evidence sufficiency of them all.

■■■ The jury, after being charged pursuant to the several paragraphs alleged in the indictment, returned a general verdict finding appellant guilty of capital murder. It is well-settled that when a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted the verdict will be upheld. *Cook v. State,* 741 S.W.2d 928, 935 (Tex.Cr.App.1987), *vacated on other grounds,* 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988), *rev'd on other grounds,* 821 S.W.2d 600 (Tex.Cr.

App.1991); *Aguirre v. State,* 732 S.W.2d 320, 326 (Tex.Cr.App.1987) (Opinion on Rehearing). Thus the State need only have sufficiently proven one of the paragraph allegations to support the verdict of guilt. We must therefore determine whether there was sufficient evidence to support the finding of guilt based upon any one of the paragraph allegations which were submitted to the jury.

■■■ It is very well-settled that in reviewing evidence sufficiency we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Cr.App. 1991); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Cr.App.1989). Though circumstantial evidence is not tested by a different standard of review than direct evidence, a conviction based upon circumstantial evidence cannot be sustained if the evidence does not exclude every reasonable hypothesis other than the guilt of the defendant.[12] *Johnson v. State,* 803 S.W.2d 272, 280 (Tex. Cr.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). We shall now view the totality of evidence in the requisite favorable light.

Appellant does not challenge the fact that he was present during and directly participated in the burglary of the decedent's residence, committing theft of credit cards and/or sexual assault upon the decedent. Nor does he challenge the fact that the jury could reasonably conclude that he committed robbery by taking credit cards and/or the keys to the decedent's car which he admittedly subsequently drove to Dallas, among other places. He also concedes that there was sufficient evidence that he committed aggravated sexual assault upon the decedent. His claim is that "[t]here is *no* evidence of [him] stabbing [the dece-

---

12. We note that the use of the "reasonable hypothesis analytical construct" has been abrogated. *See Geesa v. State,* 820 S.W.Cr. App.1991). However as such holding is not to be retrospectively applied, appellant's claim must be decided pursuant to the analytical construct. *Id.*

dent]." (Emphasis in original.) He avers that in light of that fact, the jury's finding of guilt beyond a reasonable doubt was not rational because proof which amounts to only a strong suspicion or mere probability is insufficient to support a guilty verdict.

All of the paragraphs alleged and submitted to the jury required a finding that appellant caused the decedent's death by stabbing her with a knife. None of appellant's several statements, including that made before the grand jury, admitted participating in the killing. While appellant's statements were in some ways quite inconsistent, his grand jury testimony was the most detailed. It included admitting breaking into the residence with two co-defendants. Appellant admitted having a pocketknife with him at the time of entry. He also stated that one of his cohorts usually would have had a knife in that situation. He stated that he had seen a woman lying in a bed there. He later heard scuffling from that bedroom and thought that the co-defendants were possibly tying up the decedent and putting her in a closet. He expressly stated that no one had taken their shoes off during the incident. He also stated that he saw the two co-defendants in the bedroom with one of them sitting on top of and straddling the decedent. He claimed that he was not concerned about possibly being later identified because the decedent had not seen him. Though the group was in the residence for approximately one hour, appellant insisted that he never asked his cohorts what was going on when they were alone with the decedent. During their subsequent time together driving to various places in the stolen car, appellant still claimed to have never inquired about the fate of the decedent or what had happened in the bedroom. He also denied seeing any blood on his cohorts. In other words, appellant denied seeing or hearing or participating in any brutality against the decedent. The previously-described DNA evidence refutes his denial.

The pathologist testified that the decedent received "44 wounds or groups of wounds." These included two different types of stab wounds, plus abrasions and blunt trauma contusions.[13] Testimony indicated that it was possible that the two types of stab wounds could have been made by the same instrument or different instruments. The cause of death was several stab wounds to the heart and chest. Bloody sock prints were found on the floors inside the residence. Floor tiles containing those bloody prints were compared subsequently with inked impressions of appellant and his two co-defendants. A forensic chemist testified that appellant's known ink impressions were consistent in general characteristics, such as size and shape, to the prints taken from the residence, while the two co-defendant's impressions were inconsistent. The expert witness then opined that the prints on the tiles had not been made by the two co-defendants but could not exclude appellant from possibly having made them.

The jury charge included instructions that "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense[,]" and "[i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." See TEX.PENAL CODE ANN. § 7.02 (Vernon 1974). "Conspiracy" was also defined per TEX.PENAL CODE ANN. § 15.02 (Vernon 1974). The application paragraphs of the jury charge included language incorporating the above-mentioned party and conspir-

---

**13.** Specifically 11 stab wounds were noted, plus five paired wounds which appeared to be con-
sistent with an electrical cord plug. Such a plug was found tied around the decedent's wrist.

ator culpability instructions. Such theories of culpability may be appropriately applied in a capital murder setting. *Montoya v. State*, 810 S.W.2d 160, 165 (Tex.Cr.App. 1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).

■ Based upon our review of the totality of the evidence, including the previously-detailed DNA evidence, we conclude that there was sufficient evidence for a rational trier of fact to have found beyond a reasonable doubt appellant's culpability for the alleged murder of the decedent.[14] *See Green v. State*, 682 S.W.2d 271, 286 (Tex. Cr.App.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985); *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex.Cr.App. 1979). As the murder element is the only portion of the evidence which appellant claims was insufficiently proven, we overrule point of error number five.

### IV. PUNISHMENT ISSUES

#### A. Evidence Sufficiency

Points six and seven allege insufficient evidence to support the jury's affirmative findings of "deliberateness" and "future dangerousness." Appellant's punishment jury charge contained the special issues prescribed by TEX.CODE CRIM.PROC. ANN. art. 37.071 (Vernon Supp.1989), which required the jury to make findings regarding whether appellant's conduct was committed deliberately with the reasonable expectation that the death of the decedent or another would result and whether there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.[15] The jury returned findings answering both special issues "yes."

Point number six attacks the deliberateness finding. Appellant specifically avers that the evidence clearly does not support a conscious decision by him to cause the death of the decedent. He points out that a co-defendant's written statement, which was admitted and read into evidence at punishment, indicates that the beating and stabbing of the decedent was done by the two co-defendants while appellant was busy rambling around the house procuring property and apparently did not participate in the actions against the decedent. We observe that a prior written statement by the same co-defendant, which was also admitted and read into evidence at punishment, indicated that appellant had previously initiated the idea of burglarizing the residence and had said that if anyone was inside, they were going to have to kill them. That co-defendant's first statement also indicated that while he waited outside, appellant and the other co-defendant en-

---

14. As a word of explanation we point out that it is our conclusion that a rational trier of fact could have found beyond a reasonable doubt that the murder of the decedent was committed in furtherance of the burglary and was such as should have been anticipated by appellant as a result of the carrying out of the burglary with his cohorts.

15. We note that the punishment jury charge also included the following instructions:

In connection with Special Issue No. 1, you are instructed that the word "deliberately" means something different and distinct from "intentionally." "Deliberately" as used in Special Issue No. 1, is something more than intentional and something less than premeditation. It embraces more than mere will to engage in the conduct. It means a manner of doing an act characterized by or resulting from a conscious decision involving a thought process embracing a moment of thorough consideration, a determination on the part of the actor that a person will be killed, and the actor's awareness of the consequences of his conduct.

and

You are further instructed that in answering the [S]pecial [I]ssues in this charge you will disregard the instructions given to you in the court's charge at the guilt/innocence phase concerning the law of parties. The two special issues which you are to answer now relate to the defendant's mental state and conduct rather than the mental state and conduct of any other person or persons. This does not mean, however, that in answerin [sic] Special Issue No. 1, you are not to consider what effect, if any, the mental state and conduct of others, in so far as known to the defendant, had on the defendant's mental state and conduct.

tered the decedent's residence whereupon a scream was heard; then, approximately an hour or two later, a blood-covered appellant came out of the residence and stated that "[w]e had to kill her, ..., because she busted out screaming."

In conducting this sufficiency analysis we must review the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of the special issue to have been proven beyond a reasonable doubt. *Santana v. State*, 714 S.W.2d 1, 7 (Tex.Cr.App.1986). Then we must determine whether the same evidence supports an inference other than that appellant's conduct which contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the decedent or another would result. *Id.* If it does, then a trier of fact could not reasonably find "yes" on that special issue. *Id.* Of course the State may not rely on evidence that another with whom appellant was acting acted deliberately and with a reasonable expectation that death would result, but rather the jury must determine whether appellant's own culpable conduct which contributed to the decedent's death was committed deliberately and with the reasonable expectation that death would result. *Rector v. State*, 738 S.W.2d 235, 241 (Tex.Cr.App.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 202, 98 L.Ed.2d 153 (1987).

Certainly the above described portion of the co-defendant's statement which described appellant's commitment to kill was sufficient to support the jury's finding of deliberateness. We also note that that co-defendant described appellant possessing a pocketknife on the night in question, which coincided with part of appellant's grand jury testimony. That knife was never found; however that co-defendant's knife was recovered. That co-defendant's second statement insisted that it was his knife that had been used to stab the decedent. However expert testimony from a serologist who had examined it questioned the likelihood of it being used in such manner due to the absence of blood on the blade or in the crevices and due to the presence of a large amount of unmatted lint. There was additional testimony presented to the jury at punishment that a doctor who had also examined and tested the knife had a like opinion. We conclude that there was sufficient evidence to support the jury's affirmative finding of "deliberateness" in the punishment phase of the trial.[16] Point of error number six is therefore overruled.

Point number seven alleges that the evidence is insufficient to support the jury's affirmative finding as to the issue of "future dangerousness." The appropriate standard of appellate review of an attack upon the sufficiency of evidence to support a jury's finding on special issue number two is whether the evidence, when viewed in the light most favorable to the verdict, would lead any rational trier of fact to make the affirmative finding beyond a reasonable doubt. *Miniel v. State*, 1992 WL 6866 (Tex.Cr.App. No. 70,733, delivered January 22, 1992, slip op. at 18); *Burns v. State*, 761 S.W.2d 353, 355 (Tex. Cr.App.1988); *Kunkle v. State*, 771 S.W.2d 435, 445 (Tex.Cr.App.1986), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989). It is well-settled that in deciding punishment the jury may consider all of the evidence adduced at the guilt stage, and that the circumstances of the offense

---

16. We note that in viewing the evidence in the requisite light we conclude that there was sufficient evidence to support the jury's affirmative deliberateness finding and that the evidence does not support any inference other than that appellant's conduct which contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the decedent or another would result. We also point out that there was evidence that appellant had specifically planned for several days to burglarize this residence, had previously scouted the residence in planning such action, was armed with a knife during the burglary, figured one of his co-defendants was also so armed, and sexually assaulted the decedent.

itself, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue. *Miniel, supra,* slip op. at 18; *Stoker v. State,* 788 S.W.2d 1, 7 (Tex.Cr.App.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); *Valdez v. State,* 776 S.W.2d 162, 167 (Tex. Cr.App.1989), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). Of course a jury is free to consider a great many factors in coming to an answer with regard to the "future dangerousness" special issue.

■ Appellant cites, among other things, his 24–year age, the absence of any violence in the past, and the fact that he may have been acting under a "group contagion" at the time of the instant offense as facts in contravention of the finding of future dangerousness. He also presented positive character evidence from relatives, former employment supervisors, a former high school assistant principal, a former Sunday school teacher, and a former parole officer.[17] Appellant also presented expert testimony from a psychologist and a sociologist who, among other things, questioned the ability to accurately predict future violence.[18] Documentary records of appellant's industrious performance while previously incarcerated were also introduced.

The State presented an expert psychiatrist who opined that appellant "most certainly" and "absolutely" would commit future acts of criminal violence and "definitely represent[ed] a continuing threat to society and to other people within [the] community." His former probation officer testified that appellant had indicated that he had taken the nickname of "Evil" because

he was bad. Evidence of appellant's two prior burglary of building convictions was introduced. There was also evidence that appellant had burglarized the decedent's sister's car prior to the instant offense and subsequently used the credit cards stolen in the instant offense. Jail personnel testified that they discovered several unauthorized devices which could be used as weapons in appellant's cell.[19] Notes were also recovered from that cell, in which appellant was the sole occupant, which evinced escape plans.[20] They also discovered a small finger-size hole in the wall which would have led to an unsecured stairway that apparently went into the courthouse.

In light of all of the evidence, including the facts of the offense itself, which were described in rather explicit detail in one of the co-defendant's second statement (which we again note did not implicate appellant in the assaultive conduct), we conclude that there was sufficient evidence to support the jury's affirmative finding as to the issue of "future dangerousness." We therefore overrule point number seven.

### B. Mitigating Evidence

■ Point of error number eleven avers that the trial court erred by not allowing appellant to present certain evidence in mitigation of punishment. Appellant attempted to present testimony of relatives concerning their love for him and their desire to see him live. When he asked his maternal grandmother whether she wanted him "to be able to live," the State successfully objected and secured a jury instruction to disregard her affirmative answer. When the next witness, appellant's mother, was

---

**17.** Another parole officer testified that appellant "was not a successful parolee[.]"

**18.** We note that the psychologist did testify that appellant manifested signs of a personality disorder, either antisocial or passive/aggressive. However, he added that he did not consider that diagnosis precise because people do not easily fit into general categories.

**19.** These included a part of a light fixture bracket, a piece of an air conditioner vent, some

metal parts off of a television, a steel plate from a shower stall pipe covering, a piece of steel stuck in a toothpaste tube, and a broken comb.

**20.** These notes, which a jailer identified as being written in appellant's handwriting, contained a numbered list of activities, such as "get the wall down[,]" "make one hole[,]" "clear inside exit[,]" "set bed[,]" "leave when look at last[,]" "get clear but don't be seen[,]" and "find a place to hide[.]"

asked a similar question, the trial court again sustained the State's objection and seemed to instruct appellant to refrain from asking such questions.[21] After two more of appellant's relatives testified, appellant informed the court that he wanted the record to reflect that he "would be asking each of these witnesses about their feelings as to whether [he] should receive a life sentence or death sentence[;]" whereupon the trial court responded, "The record will so reflect and the court's ruling would be the same as before." Appellant then presented testimony from five other family members.

Appellant claims that the above-noted character evidence from relatives concerning their love for him and their desire to see him live is admissible as mitigating evidence and that its exclusion was reversible error. Appellant cites *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) for support of his contention; however, we are unable to discern any such support for his claim in those opinions. Appellant does not contend that he was prohibited from introducing evidence concerning his background, character, or record, or the circumstances surrounding the offense. In fact, when any such questions were asked, the witnesses were allowed to answer. The contention here focuses on the one very particular question of whether a witness felt that appellant should live or die. Since that specific desire does not pertain to appellant's background, character, or record, or the circumstances of the offense, the trial court did not err in prohibiting it. Point eleven is therefore overruled.

█ Appellant's final point of error was submitted in a supplemental brief. That point avers reversible error in not submitting the following special issue:

> Do you find from the evidence, after considering fully the Defendant's miti-

gating evidence, if any, that the death penalty is a reasoned moral response to the Defendant's background, character, and to the crime of which he was convicted?

We observe that the record does not reflect any request by appellant for the inclusion of such a special issue in the jury charge at punishment or an objection to its absence. However, as that jury charge was prepared and submitted in March of 1989, appellant has not waived his right to assert such a claim by failing to so object or request at trial. *See, Black v. State*, 816 S.W.2d 350, 374 (Tex.Cr.App.1991) (Campbell, J., concurring) and *Selvage v. Collins*, 816 S.W.2d 390, 392 (Tex.Cr.App.1991). We therefore address the merits of his claim.

Appellant claims that in the absence of the above-quoted suggested special issue, the jury was without a vehicle to consider and give effect to the mitigating evidence which he presented. Such would be in contravention of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The alleged mitigating evidence which the jury was purportedly unable to consider and give effect to consisted of testimony which described appellant as a model employee, mannerly and quiet, respectful, and not mean, violent, or belligerent. Appellant also avers that observing his mother shooting and attempting to kill his father was such mitigating evidence. The forensic psychological expert specifically testified that the most significant events in appellant's life were the physical violence between his parents. He also argues that the fact that he lost some of the sight in one of his eyes when he tried to stop his mother and father from fighting was such evidence.

We observe that the trial court included in its jury charge submitted at punishment an instruction which stated, in part:

> In answering the [s]pecial [i]ssues, it is up to you to determine the weight and

---

21. Specifically, the trial court's response to the State's objection was, "Sustain the objection. It

will not be repeated."

credibility of the evidence, if any, the nature of the evidence, if any, as mitigating or not and its relevance to the [s]pecial [i]ssue being considered by the [j]ury. If you find that there is evidence before you that is mitigating in nature and such evidence causes you to have a reasonable doubt as to any of the [s]pecial [i]ssues, you should answer such [i]ssue or [i]ssues "no."

We conclude that the appellant's cited evidence can be given full mitigating effect through the special issues which were submitted at trial, particularly in light of the above-quoted portion of the instructions which were submitted to the jury. *Boggess v. State,* 1991 WL 87597 (Tex.Cr.App. No. 69,990, delivered May 29, 1991); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Cr.App. 1991); *Baldree v. State,* 810 S.W.2d 213, 217 (Tex.Cr.App.1991). Thus there was no error in the trial court's failure to submit appellant's above-quoted suggested special issue. We therefore overrule the supplemental point of error.

Having reviewed all of appellant's points of error we affirm the trial court's judgment and sentence.

CAMPBELL, BAIRD and BENAVIDES, JJ., concur in result.

CLINTON, J., dissents.