NUMBER 13-04-097-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

HECTOR MOYA, JR.,                                                Appellant,

 

                                           v.

 

THE
STATE OF TEXAS,                                              Appellee.

 

 

 

                  On appeal from the 105th
District Court

                           of Nueces
County, Texas.

 

 

 

                     MEMORANDUM OPINION[1]

 

                Before Justices Rodriguez, Castillo,
and Garza

                  Memorandum Opinion by Justice Castillo

 








A jury convicted appellant Hector Moya of murder.[2]  The jury assessed punishment of a ten year
term in the Institutional Division of the Texas Department of Criminal Justice
and a $5,000 fine.  By one issue, Moya
asserts that the evidence was factually insufficient to support the
conviction.  We affirm.

I.  BACKGROUND

Before dying from a single gunshot wound to his
neck, Victor Michael Sanchez implicated Moya and a man named
"Juan."  Moya, the victim=s roommate, gave a videotaped statement to police
and testified at trial, denying involvement in the murder.  

II.  FACTUAL
SUFFICIENCY

A.  Scope and
Standard of Review 








A factual‑sufficiency review begins with the
presumption that the evidence supporting the jury's verdict is legally
sufficient, that is, sufficient under Jackson v. Virginia, 443 U.S. 307,
319 (1979).  See Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996) (en banc).  In a factual sufficiency review, the
appellate court views all the evidence in a neutral light and determines
whether evidence supporting the verdict is too weak to support the finding of
guilt beyond a reasonable doubt or if evidence contrary to the verdict is
strong enough that the beyond‑a‑reasonable‑doubt  standard could not have been met.  Threadgill v. State, 146 S.W.3d 654,
664 (Tex. Crim. App. 2004) (en banc).  A
clearly wrong and unjust verdict occurs where the jury's finding is
"manifestly unjust," "shocks the conscience," or
"clearly demonstrates bias."  Prible
v. State, No. AP‑74,487, 2005 Tex. Crim. App. LEXIS 110, at *16‑*17
(Tex. Crim. App. January 26, 2005) (designated for publication).  In conducting a factual sufficiency review,
we review all the evidence.  Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).  We must consider the most important evidence
that the appellant claims undermines the jury's verdict.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  However, we
approach a factual‑sufficiency review with appropriate deference to avoid
substituting our judgment for that of the fact finder.[3]  Johnson v. State, 23 S.W.3d 1, 6‑7
(Tex. Crim. App. 2000) (en banc).  Every
fact need not point directly and independently to the accused's guilt.  Vanderbilt v. State, 629 S.W.2d 709,
716 (Tex. Crim. App. 1981).  A conclusion
of guilt can rest on the combined and cumulative force of all the incriminating
circumstances.  Id. 








Our neutral review of all the evidence, both for and
against the challenged elements, looks to determine whether proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or
whether proof of guilt, although adequate if taken alone, is greatly outweighed
by contrary proof.  See Zuniga
v. State, 144 S.W.3d 477, 484‑85 (Tex. Crim. App. 2004); see also
Zuliani v. State, 97 S.W.3d 589, 593‑94 (Tex. Crim. App.
2003).  We remain mindful of the jury's
role to resolve conflicts in testimony.  See Mosley v. State, 983 S.W.2d 249, 254
(Tex. Crim. App. 1998) (en banc) (holding that questions concerning the
credibility of witnesses and the weight to be given their testimony are to be
resolved by the trier of fact); see also Esquivel v. State, 506 S.W.2d
613, 615 (Tex. Crim. App. 1974).  We must
assume that the fact finder resolved conflicts, including conflicting
inferences, in favor of the verdict, and must defer to that resolution.  Matchett v. State, 941 S.W.2d 922, 936
(Tex. Crim. App. 1996) (en banc).          

B.  Hypothetically Correct Jury Charge








We measure the factual
sufficiency of the evidence against a hypothetically correct jury charge.[4]  Adi v. State, 94 S.W.3d 124, 131 (Tex.
App.BCorpus Christi 2002,
pet. ref'd).  A hypothetically correct
charge is one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the State's burden of proof or
restrict its theories of liability, and adequately describes the particular
offense proof.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Cano v. State, 3 S.W.3d 99,
105 (Tex. App.BCorpus Christi 1999,
pet. ref'd).  A hypothetically correct
jury charge would not simply quote from the controlling statute.  Gollihar v. State, 46 S.W.3d 243, 254
(Tex. Crim. App. 2001).  Its scope is
limited by the statutory elements of the offense as modified by the charging
instrument.  See Curry v. State,
30 S.W.3d 394, 404 (Tex. Crim. App. 2000). 

Murder is a
"result of conduct" offense.  Cook
v. State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (en banc).  We must decide whether a rational trier of
fact could have found beyond a reasonable doubt that Moya (1) intentionally or
knowingly caused Sanchez=s death, Tex. Pen. Code Ann. ' 19.02 (b)(1) (Vernon
2003), or (2)  intended to cause serious
bodily injury and committed an act clearly dangerous to human life that caused
his death,  Id. ' 19.02 (b)(2) (Vernon
2003).  A person acts intentionally with
respect to the result of his conduct when it is his conscious objective or
desire to cause the result.  Id. ' 6.03(a) (Vernon
2003).  A person acts knowingly with
respect to the result of his conduct when he is aware his conduct is reasonably
certain to cause the result.  Id.
at ' 6.03(b) (Vernon 2003).  








In determining whether
an accused participated as a party in an offense, a fact finder may examine the
events occurring before, during, and after the commission of the offense and
rely on actions of the accused that show an understanding and common design to
commit the offense.  Hanson v. State,
55 S.W.3d 681, 690 (Tex. App.BAustin 2001, pet.
ref'd).  Thus, conviction was authorized
under the evidence in this case if a rational jury could find that Moya
intentionally caused Sanchez's death, either as a principal or as a party.  See Tex.
Pen. Code Ann. ' 19.02(b)(1) & (2)
(Vernon 2003); see also Hanson, 55 S.W.3d at 690.  A person is criminally responsible as a party
to an offense if the offense is committed by his own conduct, by the conduct of
another for which he is criminally responsible, or by both.  Tex.
Pen. Code Ann. ' 7.01 (Vernon
2003).  A person is criminally responsible
for an offense committed by another if, with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts
to aid the other person to commit the offense. 
Id. ' 7.02(a)(2) (Vernon
2003).

Moya was charged under
the law of parties.  Accordingly, the
jury could convict him if it found that he was "present at the commission
of the offense and encourage[d] its commission by words or other agreement."  King v. State, 29 S.W.3d 556, 564
(Tex. Crim. App. 2000) (en banc); Ransom v. State, 920 S.W.2d 288, 302
(Tex. Crim. App. 1996) (en banc). 

C.  Inferences of Guilt








In addition to the
court's charge, we note that mental states may be inferred and proven from acts
done, words spoken, and the surrounding circumstances.  See Ledesma v. State, 677 S.W.2d 529,
531 (Tex. Crim. App. 1984) (en banc). 
Intent, in particular, is often shown by acts done, words spoken, and
conduct of the accused at the time of the offense.  See Dues v. State, 634 S.W.2d 304, 305
(Tex. Crim. App. 1982) (panel opinion); see also Conner v. State, 67
S.W.3d 192, 197 (Tex. Crim. App. 2001). 
Evidence of flight is admissible as a circumstance from which a jury may
draw an inference of guilt.  Bigby v.
State, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) (en banc).  Proof of intent generally relies on
circumstantial evidence.  See Dillon
v. State, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978).  

D.  The Evidence

Viewed in a neutral
light, the evidence showed that, on or about July 23, 2003, at approximately
2:00 a.m., police responded to a report of a shooting at Sanchez=s apartment
complex.  The first officer at the scene,
Javier Cantu, observed Sanchez prone on a second floor balcony bleeding
profusely from the left side of his neck. 
Sanchez was partially inside his neighbors= apartment,[5]
and his neighbors were tending to him. 
Cantu applied pressure to the wound to control the bleeding and
allow  Sanchez to breathe. 
Cantu asked Sanchez who he was, and Sanchez identified himself.  The jury heard the following:

Q:  . . . And
then what did you ask him after that?

 

A:  I asked
him what had happened.  He stated he was
shot.

 

Q:  Okay. . .
.  Did he indicate who shot him?

 

A:  I then
went and asked him who shot him.  He
stated that his roommate and a second . . . . 
That his roommate and a second male shot him.

 

Q:  Okay.  Did he identify who his roommate was?

 

A:  Yes, he
did.

 








Q:  And who
was his roommate?

 

A:  He stated
his roommate was Hector Moya.

 

Q:  Okay.  And did he state about a second individual?

 

A:  Yes, he
did.

 

Q:  And who
was that?

 

A:  He said
that Hector had come over with another guy by the name of Juan.

 

Q:  Okay.  Did he identify who this Juan person was . .
. other than the name of Juan?

 

A:  He said he
knew who he was, but he didn=t know theBlast name. 

 

Q:  Okay.  Did he give you any description of this
person named Juan or anything of that nature?

 

A:  Yeah.  He said . . . he was a crack head . . . that
had gone over and shot him for a payback for Juan going to jail. . . . He
stated that Juan said this, that he had gotten arrested at a drug house on
Navigation and that the crack house had gotten closed down because of this and
he had gone to jail and it was payback for that.  

 

Q:  Did he
indicate whether it was Juan who shot him or his roommate, Hector Moya?

 

A:  He stated
that Juan had shot him, that Hector had brought Juan over and that Juan had
shot him.

 

Q:  Okay.  Did he indicate that he observed Hector Moya
in the room with Juan at the time?

 

A:  Yes.  He said that both of them were in the room.

 








Cantu further testified that Sanchez said Juan
believed that Sanchez had tipped off police regarding the drug house where Juan
was arrested.  When Cantu asked the
location of the residence on Navigation, Sanchez said he did not know.  

Once paramedics removed Sanchez, still alive, from
the scene, Cantu proceeded into Sanchez=s apartment. 
The lights were on.  Cantu
observed a trail of blood from Sanchez=s blood soaked bed to the doorway.  He saw a sofa cushion on the bed with a
bullet hole in it, evidencing an attempt to muffle the shot.  

Sanchez=s neighbor, Daniel Gatchel, testified that he heard
yelling next door and also heard what appeared to be a closet door slamming
twice in succession.  He testified the
sound was strange.  He also heard
footsteps running down the stairs leading to the balcony outside the
apartment.  Shortly after, he heard
"someone pounding on his door." 
Gatchel thought someone was trying to break in.  He called police.  He looked outside and recognized Sanchez
leaning against the door.  Gatchel opened
the door and helped Sanchez to the balcony floor.  The jury heard the following:

Q:  You were
able to hear the conversation between the officer and Mike[6]?

 

A:  Yes, I
was.

 

Q:  And the
officer asked Mike what happened?

 

A:  Yes.

 

Q:  And what
did you hear?

 








A:  He said
that his roommate, Hector, and he spelled out Moya, M-o-y-a, and a person named
Juan had come in and that Juan had just gotten out of prison.  He mentioned that they were the ones thatBJuan had shot him and after that, I moved aside with
my wife to let the police do what they were doing . . . .

 

Q:  Okay. . .
. You said you listened to part of the conversation.  Did you hear anything mentioned about
Navigation Street or anything like that?

 

A:  Oh,
yes.  He had mentioned that it had been a
payback for Navigation, was his exact words, and that stuck in my mind because
I had never heard of Navigation Street and it was an enigma.

 

Gatchel testified that Moya was living in Sanchez=s apartment. 
Debra Gatchel testified she heard "Mike [say] he had been shot by aBtwo people named Hector and then a gentleman named
Juan."  When asked if Sanchez
specifically mentioned "Hector" by name, she answered, "Yes,
sir, he mentioned his name and spelled it."  The jury heard:

Q:  Okay.  Did he say both of them shot him or did he
indicate there was one that shot him?

 

A:  HeBhe didn=t say at that point, not that I recall, who pulled
the trigger, no. . . .

 

Q:  What did
you hear directly from Mike?  That=s what we=re trying to get at.

 

A:  What I
heard directly from Mike was . . . I=m trying to remember his exact words.  He said it was Hector Moya, and he spelled
out his name, and then a name JuanBman named Juan. 
He could not remember his last name, but he had just been released after
a drug bust on Navigation.

Sanchez asked the couple to call his wife, his
father, and his employer.  He directed
them to his billfold for the telephone numbers. 









Debra Gatchel further testified that the door has a
one-way lock that can only be opened from inside the apartment.  A photograph of Sanchez=s apartment door shows a deadbolt lock on the
exterior and a lever directly opposite the lock on the interior side of the
door.[7]  The victim=s
brother, Ernest Sanchez, testified that Sanchez always locked his doors and toward
"the end," Sanchez locked his bedroom door because he "started
getting nervous of his roommate" and "feared his roommate."  He admitted, however, that the victim could
not lock the door to the bathroom shared with Moya.  

Crystal Chandler, testified that her husband, the
victim, locked his bedroom door and the front door.  She was getting ready to return to live in
the apartment and Moya was to vacate within a week.  The roommates were having problems, she
stated.  Officer Tim Revis testified that
Sanchez=s bedroom door and the exterior door showed no signs
of forced entry.  He found a crack
cocaine pipe and plastic baggies commonly used to package controlled substances
in Moya=s bedroom.

On the date of the shooting, Ernest arrived at the
victim's apartment about 7:00 a.m., after leaving the hospital where the victim
was taken.  About an hour and a half
later, an unidentified driver of a brown car dropped Moya off at the
complex.  Moya was shirtless and
shoeless.  Ernest held him for
police.  Moya appeared "like he did
not know what was going on," because he was a "drug addict" and
"not in his right mind."   








Ernest admitted he waited until December 2003, to
tell police investigating his brother=s murder about his own drug addiction, his
acquaintance with Moya, and drug purchases from "Juan" on Navigation
Street.  He testified that he met Moya
about a year and a half before the trial. 
The two worked and socialized together. 
The two smoked crack cocaine together. 
Moya bought the cocaine "because of the connections that he had to
purchase the drugs."  The two went
two or three times to "Juan's house" on Navigation Street, near the
freeway, to buy cocaine.  Ernest did not
know "Juan," but Moya "would say, 'I'm going to go over there
with Juan,' and he'd get off, . . . he would go up to the house and purchase
from the doorway," "face to face with Juan."  Ernest would remain in the vehicle.  Ernest testified that his brother was aware
of his drug use with Moya and "did not like it at all."  The victim requested that Ernest vacate the
apartment because of the "partying," and Moya moved in a week
later.  Ernest testified that the victim
began using cocaine and told him he (the victim) went with Moya to the
Navigation Street house.  He further
testified he did not know and could not identify "Juan."  

The State adduced evidence to show that, on April
28, 2003, Juan Gonzalez was arrested for possession of a firearm by a felon at
a "known crack house" on Margaret Street, which intersects with
Navigation Street.  Police seized about
five grams of crack cocaine from his vehicle and his shirt pocket.  Juan was released from jail on July 6,
2003.  After Ernest disclosed knowledge
of a drug house in the area, officer Revis had him identify the house where
Moya purchased drugs.  Ernest identified
the house on Margaret Street where Juan had been arrested in April.  Officer Revis did not inform Ernest about
Juan's April arrest.








Moya's videotaped statement to police was admitted
in evidence and shown to the jury.  In
his statement, Moya denied he knew "Juan."  Officer Revis testified that Moya did not
appear to be under the influence of a controlled substance when he gave the
statement at about 1:00 p.m. on the date of the shooting.  Other than the victim's statement, officer
Revis testified that there was no evidence to show Moya was at the apartment. 

At approximately 3:20 a.m. on the date of the
shooting, officer Joe Vasquez arrived at a scene responding to a report of an
abandoned vehicle on fire.  Paperwork in
the vehicle belonged to Hector Moya, who was not present at the scene.[8]  However, a fire department investigation
concluded that the fire was accidental, caused by pouring gasoline into the
carburetor to prime it.  








Representatives from Moya's employer testified that
he tested negative for controlled substances in 2002.  Moya and the victim worked together and
appeared to be friends.  Moya's brother,
Ricky, testified that on the day before the shooting, Moya spent most of the
time with their cousin, Rey Moya, and him. 
Rey was driving Moya=s truck because Moya had been drinking and did not
want to risk a job opportunity.[9]  Ricky was left at his sister=s house at around 10 p.m.  He next saw Moya at about 3:30 a.m. when he
awoke.  Moya was washing his hands
because they smelled of gasoline.  Moya
told him his truck caught fire.  Moya was
concerned about the truck, but Ricky told him to leave it alone because Moya
"was way too drunk and . . . that was part of the reason that it caught on
fire was that he was drunk and had been trying to prime it."  They both went to bed.  When Ricky woke up around noon, Moya was
gone.  Christopher Lara, Moya's cousin,
testified that Rey, Ricky, and Moya were at a bar and grill until it closed at
2:00 a.m. at the time in question.  From
there, they gathered at his mother=s house until 2:30 or 3:00 a.m.  At that time, Moya "went
home."  April Sallinger testified
that Moya=s sister asked her to drive Moya to his apartment,
and she did at around 11:30 a.m.  Moya
appeared normal.  

Moya testified in his own defense.  He testified that before his honorable
discharge from the Marines, he served in Iraq. 
He met the victim "Mike" in early 2002.  He moved into the apartment in April 2003 at
Ernest=s request, because Sanchez=s check was insufficient to pay for the rent and one
bedroom was available.  Moya had been
living in a hotel near work.  Moya
admitted he smoked crack cocaine and "partied" with the Sanchez
brothers at different times.  Because
they were not working, he and Sanchez used drugs almost weekly.  He testified the crack pipe found in the
apartment belonged to Sanchez, but they both used it.  Moya had heard of "Juan" and saw
him once.  Sanchez considered Juan his
friend.  Sanchez bought drugs from
Juan.  Sanchez took Moya to the house on
Margaret street, and Moya saw Juan there. 
At the same time, Moya saw police activity and told Sanchez to leave.  Moya walked in to the house but "didn't
want nothing to do with that guy [Juan]." 
Sanchez occasionally lent his car to "dope dealers" in
exchange for drugs. 








Moya further testified that, in April 2003, Sanchez
was beat up once by people to whom Ernest owed money.  People called Sanchez to collect money.  Sanchez tried to collect from Ernest, who
became angry.  A woman named
"Sonia," a friend of Juan's, 
lived with them in the apartment in April because she needed a place to
stay.  She had a key and so did Crystal,
Sanchez=s wife.  The
jury heard from Moya:

Q:  Have you
been aware that we had this dying declaration issue?

 

A:  Yes, sir.

 

Q:  Do youBCan you explain that dying declaration?

 

A:  No, sir.

 

Q:  But you=re telling this jury that you were not presentB

 

A:  Yes, sir.

 

Q:  Bat the time that he was shot?

 

A:  That's
correct.

 

Q:  You
weren't with Juan or anybody that night?

 

A:  No, sir,
I've never been with Juan anywhere. 

 

Moya further testified, "I wasn't involved and
I don't know Juan.  I know who he
is.  I've seen him on two
occasions."  Moya later testified
that the only Juan he "had ever heard of was supposed to be in jail."


E.  Discussion








The State presented evidence on both principal and
party theories.  The jury charge
contained an instruction on both theories. 
Thus, the charge authorized the jury to find Moya guilty if he acted
either as a party or as a principal to the offense.  The jury rendered a general verdict of guilty.  Thus, if evidence of guilt is sufficient, we
will affirm the verdict based on either theory. 
See Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992)
(en banc); Edwards v. State, 106 S.W.3d 833, 839 (Tex. App.BDallas 2003, pet. ref'd) (holding that if evidence
of guilt is sufficient either as principal or as party, appellate court must
affirm jury's verdict); see also Kitchens v. State, 823 S.W.2d 256,  259 (Tex. Crim. App. 1991).

1.  Identity

Moya denied he shot Sanchez.  He denied he was present when the shooting
occurred.  He provided alibi
evidence.  The jury heard Moya deny he
knew Juan, admit he saw him once at a crack house, and admit he saw him
twice.  Where identity is an issue in the
case, the identity of the perpetrator may be proved by direct or circumstantial
evidence.  Earls, 707 S.W.2d at 85
("Evidence as to the identity of the perpetrator of an offense can be
proved by direct or circumstantial evidence.").  








Sanchez's statement qualifies as a dying
declaration.[10]  Tex.
R. Evid. 804(b)(2); Thomas v.
State, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985).  Evidence places the victim in his bed when
shot.  Three detached witnesses
corroborated that Sanchez identified Juan as the shooter and placed Moya in the
room when the shooting occurred. 
Evidence showed that Sanchez always locked the apartment.  Access inside was solely by using a key from
the outside or turning the lever on the inside. 
No evidence exists of a forced entry either to the apartment or to
Sanchez=s room.  

2.  Intent

        Moya
denied that he and Sanchez were experiencing difficulties. 
Evidence shows that Sanchez locked his bedroom door because he feared
Moya.  Sanchez had requested that Moya
vacate the apartment within a week. 
Juan, by all accounts a drug dealer, sold cocaine consumed by Moya and
Sanchez.  Two months before the shooting,
Juan was arrested for a felon in possession offense.  At the time of the arrest, cocaine was seized
from his person and his vehicle, while outside the crack house near the
intersection of Margaret and Navigation Streets.  According to Sanchez=s dying declaration,
Juan said the shooting was "payback" because he was arrested at the
crack house, and the crack house was closed down as the result.  The only way Juan had access to Sanchez's
room at 2:00 a.m., absent forced entry, was with a key or with permission.  According to Sanchez=s dying declaration,
Moya "had brought Juan over." 
After hearing two strange sounds in succession, like a door closing,
Sanchez=s neighbor heard
someone running down the stairs.  Because
neither of the individuals Sanchez's dying declaration placed in the apartment
were present after the shooting, both fled. 








F.  Disposition

The jury was
authorized to convict Moya as a party to murder if the evidence showed that,
if, with intent to promote or assist the commission of the offense, he
solicited, encouraged, directed, aided, or attempted to aid the other person to
commit the offense.  Tex. Pen. Code Ann. ' 7.02(a)(2) (Vernon
2003).  In our sufficiency review, we are
governed by the fact that the jury is the exclusive judge of the facts proved,
the credibility of the witnesses, and the weight to be given to the testimony.  Earls, 707 S.W.2d at 85; Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979).  The jury may believe or
disbelieve all or any part of a witness's testimony, even though the witness's
testimony has been contradicted.  Earls,
707 S.W.2d at 85 (citing Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim.
App. 1986)).  Reconciliation of conflicts
in the evidence is within the exclusive providence of the jury.  Id. (citing Jones v. State, 944
S.W.2d 642, 647 (Tex. Crim. App. 1996)). 
Evidence is not rendered insufficient when conflicting evidence is
introduced.  Matchett, 941 S.W.2d
at 936.

In this case, the jury
was free to place whatever value it wished on Moya's statement.  See Wesbrook v. State, 29 S.W.3d 103,
112 (Tex. 2000) (en banc).  The State
presented testimony throughout the trial of witnesses who recalled the key
events that occurred on July 23, 2003. 
Moreover, the jury was free to disbelieve Moya's statement to police and
testimony, to reconcile any discrepancies in the testimony before it, and to
judge the credibility of the witnesses.  See
id. at 111.  By its verdict, the jury
rejected evidence of alibi.  








Having reviewed all
the evidence in a neutral light with appropriate deference to the jury's
credibility determinations, we conclude that the evidence demonstrates that a
rational trier of fact could have found beyond a reasonable doubt that Moya
participated in this offense as a party. 
King, 29 S.W.3d at 564; Ransom, 920 S.W.2d at 288.  The jury could reasonably infer that Moya
aided Juan in the commission of the offense by providing him the only available
access to Sanchez at 2:00 a.m.  The jury
could reasonably infer guilt from the evidence that Moya fled the scene.  See 
Bigby, 892 S.W.2d at 883. 
That the evidence of guilt was not free of contradiction and that the
credibility of witnesses may have been subject to question does not require us
to conclude that the verdict was factually insupportable.  See Zuliani, 97 S.W.3d at 593‑94.  Those circumstances merely created issues for
the jury to resolve.  Id.   

We conclude that the
evidence supporting the verdict is not too weak to support the jury's finding
of Moya's participation as a party nor is the weight of the evidence contrary
to the verdict strong enough that the State could not have met its burden of
proof.  See Zuniga, 144 S.W.3d at
484‑85.  We conclude the evidence
was factually sufficient to support the conviction.  Id. 


We overrule Moya's
sole issue.

III.  CONCLUSION








          We
affirm the jury=s verdict on the
theory that Moya participated as a party to murder.  See Tex.
Pen. Code Ann. ' 7.02(a)(2) (Vernon
2003); see also Rabbani, 847 S.W.2d at 558; Kitchens, 823 S.W.2d
at 259; Edwards, 106 S.W.3d at 839.

 

ERRLINDA CASTILLO

Justice

 

Do not publish.

Tex.
R. App. P. 47.2(b).

 

Memorandum Opinion delivered 

and filed this 16th day of June, 2005.

 

 

 

 

 

 

 

 

 

 

 

 

 











[1]See Tex. R.
App. P. 47.1, 47.2,
& 47.4.





[2] A person commits murder if he
intentionally or knowingly causes the death of an individual, or intends to
cause serious bodily injury and commits an act clearly dangerous to human life
that causes the death of an individual. Tex.
Pen. Code Ann. '19.02 (b) (Vernon 2003).  The indictment alleged that, on or about July
23, 2003, Moya (1) intentionally and knowingly caused the death of Victor
Michael Sanchez by shooting him with a firearm and, (2) with intent to cause
serious bodily injury to Victor Michael Sanchez, committed an act clearly dangerous
to human life that caused the death of Sanchez by shooting him with a
firearm.  When a general verdict is
returned and the evidence is sufficient to support a finding of guilt under any
of the paragraph allegations submitted, the verdict will be upheld. Fuller
v. State, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992).  Thus, the State need only sufficiently prove
one of the paragraph allegations to support the guilty verdict. See id.;
Tex. Code Crim. Proc. Ann.
art. 37.07 ' 1(a) (Vernon Supp. 2004‑05)
(verdict must be general).  

 

 





[3] We always remain aware of the fact
finder's role and unique position, a position we are un-

able to occupy.  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000) (en banc).  Exercise of
our authority to disagree with the fact finder's determination is appropriate
only when the record clearly indicates our intervention is necessary to stop
manifest injustice.  Id.  Otherwise, we accord due deference to the
fact finder's determinations, particularly those concerning the weight and
credibility of the evidence.  Id.  Absent exceptional circumstances, issues of
witness credibility are for the jury, and we may not substitute our view of the
credibility of a witness for the constitutionally guaranteed jury
determination.  Id.; Tex. Code Crim. Proc. Ann. art.
38.04.  (Vernon 1979).





[4] 
The court of criminal appeals has not specifically applied the
hypothetically correct jury charge analytical construct to factual‑sufficiency
reviews in jury trials.  See Zubia v.
State, 998 S.W.2d 226, 227 n.2 (Tex. Crim. App. 1999) (per curiam) (en
banc) (dismissing as improvidently granted the question of whether Malik
should extend to factual grounds not submitted to the jury).  





[5] Cantu testified Sanchez had
minimal clothing, "like he was woken up from a sleep."  





[6] "Mike" was the victim,
Victor Michael Sanchez's nickname.





[7] 
Officer Revis described it as a safety lock that could only be opened
from inside the apartment.





[8] 
Evidence showed that the reporting party told dispatchers that they had
observed a male standing near the truck at the time they noticed the fire.





[9] According to Ricky, Moya did not
want to risk being charged with a DWI.





[10] A statement meets the dying
declaration exception to the hearsay rule when the declarant 

is unavailable at the time of trial and the statement is
"[a] statement made by a declarant while believing that the declarant's
death was imminent, concerning the cause or circumstances of what the declarant
believed to be impending death." Tex.
R. Evid. 804(b)(2). Sanchez died. See Tex. R. Evid. 804(a)(4). 
A declarant's belief that death was imminent "may be inferred from
the circumstances of the case, such as the nature of the injury, medical
opinions stated to him, or his conduct." 
Thomas v. State, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985).  The medical examiner opined that, aware of
his significant blood loss, Sanchez would be in fear of dying.  He testified Sanchez lived about forty-four
hours after the gunshot.