**Affirmed and Memorandum Opinion filed June 19, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-00188-CR
_____

**ERNESTO GONZALEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 180th District Court
Harris County, Texas
Trial Court Cause No. 1176123**

## MEMORANDUM OPINION

Appellant, Ernesto Gonzalez, appeals his conviction for capital murder. Tex. Penal Code Ann. §§ 12.31(a), 19.03(a)(2) (West 2011). Finding no error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

At approximately 5:00 a.m. on April 27, 2008, Houston Police officers, including David Rodriguez, responded to a call reporting a shooting near the intersection of Westview and Gessner in the Spring Branch area of Houston. The responding officers eventually located the person who had reported the shooting: Joseph Oliver. Oliver then directed the police to an apartment complex on Westview. After arriving at the apartment

complex, the officers found the complainant, Horace Luna, slumped over the hood of a car. (3RR23-32) Additional police arrived at the scene including Ruth Nunez, the crime scene investigator, and homicide detectives Dan Arnold and John McGalin. The investigators discovered a small-caliber gunshot wound to the complainant's back. They also located an unfired .380 caliber bullet and a piece of PVC pipe that was splattered with blood.

Oliver told the police that shortly before the shooting occurred, he was walking on the sidewalk of Westview behind two "Mexican dudes." According to Oliver, he eventually passed the two men and was continuing to walk near the Westview Gardens Apartments when he saw a large black sport utility vehicle ("SUV") that resembled an Expedition, Tahoe, or Suburban, pull up in front of the two Mexican men. Oliver saw the front passenger side door open and a single Mexican man get out of the vehicle wearing a black and white bandana covering his mouth and nose. According to Oliver, this man was between five feet, six inches and five feet, eight inches tall, he weighed about 160 pounds, and his head was shaved. Oliver saw the man turn toward the two walking men, point like he was aiming at them, and demand that they give him their money.[1] One of the men raised his hands into the air and said he did not have any money. At that point, Oliver began running away and he then heard two gunshots. Oliver hid for about ten minutes. When he came out of hiding, Oliver saw the complainant awkwardly slumped over on the trunk of a car, dead. Oliver testified he did not see what happened to the second man.[2] Oliver went to a nearby convenience store to call the police and he flagged down an officer and directed him to the scene.

The investigating officers eventually determined that the complainant's murder was related to seven other armed robberies that occurred in southwest Houston in the two-hour period before the complainant's murder. Testimony and evidence admitted during

---

[1] Oliver testified that he never actually saw any type of gun.

[2] The police were never able to fully identify or locate the second man.

2

appellant's trial demonstrated that the seven robberies[3] involved a black Tahoe or SUV and were committed in a manner similar to the complainant's murder.[4]

The seven robberies began when Christian Leal and members of his family were leaving Ruchi's Restaurant located at 7500 Westheimer. According to Leal, he, his wife, and his sister-in-law left the restaurant around 3:00 a.m. and got into his vehicle, a black, 2002 Chevrolet Tahoe. Leal testified that after he started the Tahoe, someone pulled his door open and he then saw a silver gun pointed at him. Leal testified the robber was wearing a black bandana and he was either black or Hispanic. The robber demanded that they get out of the Tahoe and for Leal to give him his wallet. At that point, the robber pulled Leal out of the vehicle and ordered him to lie on the ground. According to Leal, the robber then got into the Tahoe and drove away.

The second robbery occurred at about 3:30 in the morning at a pool hall located at 7637 Dashwood. In this robbery, a man named Martinez was robbed of his wallet.

The third robbery occurred at a Valero gas station located at 7702 Bellaire. Mohamad Machlab testified that he went to the Valero station between three and four in the morning of April 27, 2008. Machlab pulled his vehicle into a parking space. A Ford Explorer pulled up beside Machlab and a female got out of the Explorer to ask him for directions. At that point, a black Escalade or Tahoe containing three individuals pulled up behind Machlab's vehicle. A single Hispanic male got out of the passenger door on the driver's side of the black SUV and proceeded to rob Machlab and the female at gunpoint. According to Machlab, the robber had a hood up on his head, but there was nothing covering his face. Machlab testified the robber was between five feet nine inches and five feet ten inches tall and he used a shiny pistol. After robbing the two of them, Machlab testified that the robber backed up, got back into the black SUV with the other two

_____

[3] One of the seven related crimes was actually an attempted robbery; however, for ease of reference we refer to all of the related crimes as robberies.

[4] Appellant lodged no objections to any of the testimony and other evidence detailing the seven other robberies.

individuals and they drove off. Machlab noticed that when the robber was backing up and getting into the black SUV, he dropped a wallet. After the black SUV drove off, Machlab picked up the wallet and he turned it over to the police. The wallet belonged to Martinez, the man robbed at the pool hall. Machlab eventually picked appellant out of a photospread and identified him as the man that robbed him at gunpoint.[5]

The fourth robbery occurred at a Whataburger restaurant located at 3800 Southwest Freeway at approximately 4:15 a.m. At the Whataburger, Matt Nelson, Brian Alves, and three female acquaintances were preparing to drive home in two separate cars. As Nelson was clearing space in his back seat, a black Tahoe pulled up behind their vehicles, blocking them from moving. After the Tahoe stopped, a single person got out from the driver's side and approached Alves and the three females. Alves, who was six feet eight inches tall, testified the robber was "a little fellow," he was wearing a hoodie, and he had a bandana covering most of his face. The "little fellow" was carrying a silverish semi-automatic pistol and he ordered all of them to lie on the ground and give him their money. While the robbery was in progress, Alves saw a second man get out of the black Tahoe holding a gun that looked similar to a sawed-off shotgun that the police later found in appellant's apartment. Alves also observed a third person inside the Tahoe. Alves got the Tahoe's license plate number and it matched the license plate number of Leal's stolen Tahoe.

The fifth robbery occurred in the parking lot of the Mezzanine Lounge about fifteen minutes after the Whataburger robbery. The Mezzanine Lounge is located a few minutes' drive away from the Whataburger near the intersection of Greenbriar and the Southwest Freeway. Emily Bynum had just gotten off work from her job as a bartender at the Mezzanine Lounge and she and a co-worker were walking toward their cars when the co-worker said in a panicked voice for Bynum to get in her car. Bynum ran to her car, got in, and locked the doors using her key remote. Almost immediately someone wearing a black bandana across the top of his nose and a dark sweater was at her window holding a

---

[5] The female in the Explorer drove away before police arrived at the scene.

shiny gun to her face and angrily demanding that she open her door and get out. Bynum refused and instead tried to start her vehicle, but the engine had been killed when she locked the doors and set the alarm. The would-be robber became more and more angry and he banged his hands on the door and window of her vehicle, which set off the alarm. After a short while, he walked away and got back into his vehicle, a black SUV.

Scott Lanquist testified during appellant's trial. Lanquist was waiting inside his own vehicle for his girlfriend to get off from work at the Mezzanine Lounge in the early morning hours of April 27, 2008. Lanquist saw two females exit the club and walk toward their vehicles when he saw a black Tahoe quickly drive into the parking lot and stop in front of the girls' vehicles. Lanquist saw the driver get out of the Tahoe and approach one of the blocked cars and start what he thought was an argument. Lanquist saw the man bang on the female's car, setting off the alarm. He then saw the driver get back in the Tahoe and it quickly drove away. Lanquist saw two other people inside the Tahoe, one in the front passenger seat and the second sitting in the middle of the back seat leaning forward in between the two front seats.

The day after the attempted robbery, Officer James McIntosh processed Bynum's car for fingerprints. McIntosh recovered two partial fingerprints from the driver's side window. Fingerprint expert John Lazzaretto testified that one of the fingerprints recovered by McIntosh matched appellant's left middle finger. Bynum later identified appellant in a police photospread and again during trial as the person who attempted to rob her in the Mezzanine Lounge parking lot.

The sixth robbery occurred in the parking lot of the Walmart located at 10750 Westview just before five in the morning on April 27, 2008. Stephen Pak was driving out of the parking lot when a black SUV drove up and stopped in front of his car, blocking him from driving forward. Pak testified that a single Hispanic man wearing a black hood got out of the passenger side of the SUV and approached him carrying a pistol. The man demanded Pak give him his money. Pak described the pistol as silver with a darker color.

5

According to Pak, the man did not have anything covering his face. After Pak gave him his wallet, the man went back to the SUV and it drove away. Pak was able to get the SUV's license plate number and it matched the license plate of Leal's stolen Tahoe.

During the police investigation, Pak was unable to positively identify anyone as the man who robbed him when shown a police photospread. Pak told the investigators that the person in one of the photos had features similar to the person who robbed him. The photo pointed out by Pak was a photo of Giovanni Alecio. During appellant's trial, Pak denied that he told the police the person he picked out in the photospread was the person who robbed him. In addition, during appellant's trial, Pak testified that State's Exhibit 22, a photograph of appellant, resembled the person who robbed him. Appellant recalled Pak to testify during his case-in-chief. During this testimony, Pak testified that he would be able to identify the person who robbed him if he saw him again and he then positively identified appellant as that person.

The seventh robbery took place a few minutes later in the drive-through lane of the McDonald's restaurant located at the intersection of Wilcrest and Interstate 10. Margaret Mallia was in the drive-through lane buying a cup of coffee when a black Tahoe crashed into her car. At that point, a single Hispanic male wearing a black sweatshirt without a hood came up to her car window and demanded her money at gunpoint. Mallia testified the gun was silver. Mallia also testified the man was not wearing a bandana on his face. After getting her purse, the man returned to the Tahoe and it drove off. Mallia got the license plate number of the Tahoe and turned it over to the police.

In July of 2008, Officer Stewart Hood was on patrol when he located Leal's stolen Tahoe illegally parked and blocking a lane of traffic. Hood found the Tahoe parked halfway out of an apartment complex gate in the 2700 block of Dunvale, near Westheimer. According to Hood, there was no one inside the Tahoe. The Tahoe was towed to the Houston Police Department's vehicle examination building, where Officer D.C. Lambright, a crime scene investigator, processed it for evidence. Lambright found a

credit card belonging to Matt Nelson inside the Tahoe. Lambright also located fingerprints on both the interior and exterior of the Tahoe. Lambright sent these fingerprints to be analyzed. Fingerprint analysts determined that some of the fingerprints matched those of Giovanni Alecio.

Police investigators subsequently located and interviewed Alecio. According to detective Arnold, as the investigation progressed, the police became satisfied that Alecio was not one of the participants in the seven robberies or the complainant's murder. In addition, Alecio told the police that he knew two individuals, Jose Luis Cardenas and appellant, who were involved in the crime spree. Fingerprint analysis revealed that some of the fingerprints found on Leal's Tahoe matched Cardenas's fingerprints.

On July 24, 2008, the police went to appellant's apartment and asked to speak with him. The police also asked if appellant would consent to a search of his apartment. Appellant consented to the search. During the resulting search, the police discovered a New Ithaca sawed-off, double-barrel 12-gauge shotgun. The police took appellant into custody at that time.

On July 25, 2008, investigators Arnold and McGalin interviewed appellant. At the time of the interviews, appellant was a suspect in the murder but he had not yet been charged. The questioning resulted in two videotaped interviews. In both interviews, the police read appellant his rights. Appellant waived his rights and agreed to speak with the police. The two videotapes, as well as a transcript of both, were admitted into evidence without objection by appellant.

In the first interview, appellant told the investigating officers that his friend Luis Cardenas picked him up in a black Tahoe. Appellant also told the officers that there was another Hispanic male in the Tahoe, a friend of Cardenas's that he did not recognize. According to appellant, Cardenas was sitting in the front passenger seat, the stranger was driving, and he rode in the back seat on the passenger side occasionally moving into the middle. According to appellant, after picking him up, they drove toward the Beltway with

7

the driver explaining that they were going to "jump out on some guys" to come up with some quick cash. Appellant admitted he knew they were going to commit robberies. Appellant admitted the driver had a chrome-colored handgun. In addition, appellant admitted he was present in the Tahoe during three criminal episodes that occurred that morning: the first occurring on the feeder road of the Beltway; the second at the Walmart parking lot close to the Beltway; and the third, the attempted robbery and murder of the complainant. Appellant told the police it was the driver who committed each of the crimes, including the shooting of the complainant. Appellant admitted he was wearing a dark blue hoodie that evening, but denied that he wore a bandana or gloves. Appellant did admit to the officers that he knew what he was getting involved in, he knew the Tahoe did not belong to Cardenas or the driver, and that he had put himself in the situation. Appellant told the police that once the complainant was shot, he told Cardenas and the driver to drop him off at a friend's nearby apartment. Appellant denied he was present at the other robberies that the police believed were connected to the complainant's murder. The first interview ended at 10:30 a.m., approximately a half hour after it started.

About an hour after the first interview ended, appellant told the investigators he wanted to speak with them again. During the ensuing second interview, appellant admitted that he was present at the Walmart, McDonald's, and Whataburger robberies. Appellant also told the police he got out of the Tahoe during the Whataburger robbery while the driver threw stuff into the Tahoe. Appellant told the police he did not recall any other robberies that night, denied he ever possessed a weapon that night, and told the police there was only a single gun used during all of the crimes.

Appellant also admitted during the second interview to being present when the complainant was murdered. Appellant then described the murder for the police investigators. Appellant claimed they turned off of Interstate 10, drove north on Gessner and turned west at an intersection. While driving down that street between two apartment complexes, the driver turned off the Tahoe's lights, pulled up in front of two men walking

along the street, put the Tahoe in park, and the driver got out of the Tahoe. The driver then went around the Tahoe and approached one of the men. According to appellant, the man walked away, the driver approached him again, and that was when he heard a gunshot. After the murder, appellant told the police he was not dropped off at a friend's apartment; instead they drove back to his apartment complex where they parked the Tahoe. According to appellant, he and Cardenas went into his apartment but appellant refused to allow the driver into his apartment. Appellant then went to sleep. After waking up the next day, appellant told Cardenas to take the Tahoe and get rid of it because he did not want anything to do with it.

At the close of the evidence, the case was submitted to the jury by the trial court. The court's charge authorized the jury to convict appellant of capital murder if it found beyond a reasonable doubt that he was responsible for the complainant's death either individually, as a party, or as a co-conspirator with Cardenas and/or another person or persons. The jury found appellant guilty of capital murder. The trial court then imposed the automatic punishment of confinement for life without the possibility of parole. This appeal followed.

DISCUSSION

Appellant raises two issues on appeal. In his first issue, appellant contends the trial court erred when it admitted into evidence "[t]estimony and exhibits of extraneous crimes, conduct, wrongs, bad acts, specifically seven other aggravated robberies that occurred before the murder in question." In his second issue, appellant contends the evidence is insufficient to support his conviction for capital murder. We address his second issue first.

## I. Sufficiency of the Evidence

Appellant contends the evidence is insufficient for four reasons. First, appellant asserts the evidence is insufficient because the only eyewitness who testified during his

9

trial was unable to identify him as the person who shot and killed the complainant. Second, appellant argues the evidence is insufficient because Alecio and Cardenas did not testify and provide direct evidence implicating him in the murder of the complainant. Third, appellant asserts there is no evidence that he acted as a party, a co-conspirator, or was the driver/gunman during the crime spree that ended with the complainant's murder. Finally, appellant argues there is no physical evidence connecting him to the murder scene or the stolen black Tahoe. Appellant contends that, at most, the evidence established that he was a "mere backseat passenger in the vehicle in question and that he did not have any knowledge that the driver of the vehicle was going to shoot the murder victim, nor ever anticipated same."

### A.     The Standard of Review and Applicable Law

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); *Pomier v. State*, 326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.* The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). An appellate

10

court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

A jury may infer knowledge or intent from the acts, conduct, and remarks of the accused, and from the surrounding circumstances. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). Direct evidence of the elements of the offense is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Juries are permitted to make multiple reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Id.* at 14–16. Circumstantial evidence alone can be sufficient to establish guilt. *Id.* at 15.

A person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. § 19.03(a)(2). A person commits murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). A person commits a robbery if, in the course of committing theft, and with the intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a)(2) (West 2011).

Under the law of parties, a "person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a) (West 2011). A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* at § 7.02(a)(2).

11

A person is also "criminally responsible" for an offense committed by the conduct of another when "in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators … if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy." *Id.* at § 7.02(b). A defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Love v. State*, 199 S.W.3d 447, 452 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Fuller v. State*, 827 S.W.2d 919, 932–33 (Tex. Crim. App. 1992)). Therefore, the State is not required to present evidence of a criminal defendant's intent to kill as long as the evidence establishes that a felony was committed as a result of a conspiracy and the murder should have been anticipated in carrying out the conspiracy to commit the underlying felony. *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex. Crim. App. [Panel Op.] 1979).

A reviewing court may look to events before, during, and after the commission of the offense to determine whether an individual is a party to the commission of the offense. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987). Circumstantial evidence may be sufficient to show that one is a party to an offense. *Id.* Mere presence alone will not make one a party to an offense; nevertheless it is a circumstance tending to prove that a person is a party to the offense and when taken with other facts may be sufficient to show that he was a participant. *Wygal v. State*, 555 S.W.2d 465, 469 n.3 (Tex. Crim. App. 1977).

## B. Analysis

We turn first to appellant's contentions that the evidence is insufficient because the one eyewitness who testified during his trial was unable to identify him as the shooter and because Alecio and Cardenas did not provide direct evidence connecting him to the complainant's murder. Because direct evidence of the elements of the charged offense is not required, appellant's initial contentions are without merit. *Hooper*, 214 S.W.3d at 14.

12

Appellant also asserts the evidence is insufficient because there was no physical evidence connecting him to the crime scene or the black Tahoe. Because appellant's own statements place him inside the black Tahoe and at the crime scene when the complainant was shot, we reject his contention that the lack of physical evidence renders the evidence insufficient.

Finally, appellant argues that the evidence is insufficient to support his capital murder conviction because, in his view, the only thing the evidence established was that he was a "mere backseat passenger in the vehicle in question and that he did not have any knowledge that the driver of the vehicle was going to shoot the murder victim, nor ever anticipated same." We disagree.

The jury was instructed that it could find appellant guilty of capital murder in any of three different ways: (1) as a principal; (2) as a party under section 7.02(a)(2) of the Texas Penal Code; and (3) as a co-conspirator under section 7.02(b) of the Texas Penal Code. The jury returned a general verdict; therefore, if the evidence is sufficient to support a guilty finding under any of the allegations submitted, we must uphold the jury's guilty verdict. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

The evidence against appellant includes his two videotaped statements. In those statements appellant admitted he was picked up in a black Tahoe by two men he knew did not own the vehicle. Appellant also admitted during his statements that he knew they were going to commit robberies that night and that one of his companions was armed with a chrome-colored handgun. In addition, appellant admitted that he was present during several of the seven criminal incidents leading up to the shooting of the complainant. While denying any direct involvement in any of the robberies or the attempted robbery of Bynum, appellant admitted he got out of the Tahoe during the Whataburger robbery while one of his companions threw "stuff" into the back of the Tahoe.

13

The evidence also included the testimony of three eyewitnesses who identified appellant as the primary gunman in three out of the seven robberies.[6]   In addition, appellant's fingerprints were found on Bynum's car.   A sawed-off shotgun was found in appellant's apartment and was admitted into evidence during appellant's trial.   Brian Alves testified it resembled the firearm brandished by the second robber to get out of the Tahoe during the Whataburger robbery.

Viewing the evidence summarized above in the light most favorable to the verdict, we conclude the evidence is sufficient to establish appellant's guilt as either a party under section 7.02(a)(2) of the Texas Penal Code or as a co-conspirator under section 7.02(b) of the Texas Penal Code.   We overrule appellant's second issue on appeal.

## II.     Admission of Evidence

In his first issue, appellant complains the trial court erred when it admitted into evidence during appellant's trial, testimony and exhibits related to the seven robberies the police believed were connected to the complainant's murder.   The State asserts appellant failed to preserve this issue for appellate review because he failed to lodge contemporaneous objections.   We agree.

If a party does not want an extraneous offense admitted at trial, he must object when the evidence is presented in order to preserve his complaint for appellate review. *McMillan v. State*, 940 S.W.2d 767, 769 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)).   The objection must be timely, proper, and specific.   *Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004).   In addition, the party must object every time the objectionable evidence is offered.   *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Because appellant failed to object to the admission of any of the evidence related to the seven robberies, we hold he has not preserved this issue for appellate review.   *Harris v.*

---

[6] The three robberies were the Walmart robbery, the attempted robbery of Bynum in the Mezzanine Lounge parking lot, and the Valero robbery.

*State*, 204 S.W.3d 19, 27 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing Tex. R. App. P. 33.1(a)).

Even if appellant had preserved this issue for appellate review, the result would be the same as evidence of the seven robberies was admissible to connect appellant to the complainant's murder. While evidence of extraneous offenses is normally not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character, extraneous offense evidence may be admissible when it has relevance apart from character conformity. Tex. R. Evid. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Extraneous offense evidence may be admissible to show proof of motive, opportunity, intent, preparation, knowledge or identity. *Devoe*, 354 S.W.3d at 469. Whether extraneous offense evidence has relevance apart from character conformity is a question for the trial court. *Id.* Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Id.* As long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion and the trial court's ruling will be upheld on appeal. *Id.* A trial court's Rule 404(b) ruling is generally within this zone if there is evidence supporting a determination that an extraneous transaction is relevant to a material, non-propensity issue. *Id.*

Here, the identity of the perpetrator of the complainant's murder was a contested issue. Appellant's defensive theory was that he was merely a backseat passenger in the Tahoe when the complainant was murdered. The State's case against appellant was based on circumstantial evidence. As a result, the State needed the evidence of the extraneous offenses to connect appellant to the complainant's murder. We hold the trial court did not abuse its discretion when it determined that evidence of the seven robbery crime spree was admissible. *See id.* at 470 (holding, in a capital murder case, evidence of other crimes committed during a crime spree was admissible to establish the identity of the perpetrator).

We overrule appellant's first issue on appeal.

15

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.


/s/  Leslie Brock Yates
    Senior Justice


Panel consists of Justice Seymore, Boyce, and Senior Justice Yates.[7]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[7] Senior Justice Leslie Brock Yates sitting by assignment.