**AFFIRM; and Opinion Filed December 29, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00152-CR

### MICHAEL DAVID MERCADO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1435009-Q**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Myers, and O'Neill[1]
Opinion by Justice O'Neill

A jury convicted Michael David Mercado of capital murder in the death of his girlfriend's two-year-old son. *See* TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2016). In two issues, appellant challenges the sufficiency of the evidence to support his conviction and contends the trial court abused its discretion by admitting extraneous evidence of a prior felony conviction. We affirm the trial court's judgment.

### I. BACKGROUND

On November 19, 2014, appellant was caring for D.M., the son of his girlfriend Gabriella Martinez. D.M. was two and one-half years old. Appellant, Martinez, and D.M. lived in an apartment with appellant's grandfather. That morning before leaving for work, Martinez

---

[1] The Hon. Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

changed D.M.'s diaper. Martinez did not observe any bruises or marks on D.M.'s body other than two bruises on his face. Appellant had explained to Martinez the week before that the bruises resulted when D.M. fell and hit an air compressor in the apartment. Martinez then drove herself to work, accompanied by appellant and D.M. At approximately 9:30 a.m., appellant drove D.M. to a Jack In The Box restaurant for a meal. In the drive-through lane, they were greeted by Patrick Starks, who took their order and recognized them as regular customers. Starks saw D.M. in his carseat in the back seat of the car. He did not notice anything unusual about D.M. He waved to D.M. and D.M. waved back.

Appellant and D.M. returned home. At approximately 3:00 p.m., paramedics responded to a call at the apartment. They found D.M. nonresponsive, lying supine on the floor. Appellant, who identified himself as D.M.'s stepfather, told the paramedics that D.M. had a seizure and fell down, probably hitting his head on the floor. The paramedics transported D.M. to Children's Medical Center of Dallas. D.M. remained unresponsive throughout the trip and upon arrival at the hospital.

At the hospital appellant spoke with police and with a worker from Child Protective Services. Appellant recounted the trip to Jack In The Box and said that D.M. did not finish eating his hash browns, which was unusual. Appellant also said that D.M. was talking and dancing in the car. Appellant explained that he and D.M. returned home, and spent the remainder of the morning and the early afternoon there. No one else was at home. According to appellant, D.M. was behaving as a normal active two-year-old throughout the day. D.M. took a nap; he and appellant then watched television. Appellant explained that around 2:30 p.m., he got up to walk to the kitchen. D.M. started to follow. Appellant then heard a noise and went back to the living room. Appellant said that D.M. was lying face up on the floor and had started shaking as if he was having a seizure. Appellant attempted to revive D.M. and then called 911.

At the hospital D.M. was examined by an emergency room doctor, a pediatric neurosurgeon, and a doctor with expertise in child abuse, among others. These doctors determined that D.M. had suffered a massive brain injury. D.M. died on November 21, 2014, never having regained consciousness. Appellant was arrested and charged with murder.

Doctors who examined D.M. and medical examiners who conducted D.M.'s autopsy testified at trial. A Child Protective Services worker who observed D.M.'s injuries and who interviewed appellant also testified. These witnesses included:

- Dr. David Rodriguez, an emergency room pediatrician;

- Dr. Angela Price, a pediatric neurosurgeon;

- Dr. Matthew Cox, a pediatrician with expertise in child abuse;

- Alicia Fitzpatrick, who at the time of D.M.'s admission to the hospital was employed by the Texas Department of Family and Protective Services in the Child Protective Services ("CPS") division;

- Dr. Stephen Hastings, a medical examiner, who conducted the autopsy; and

- Dr. Reade Quinton, a medical examiner, who supervised Dr. Hastings.

Dr. Rodriguez testified that D.M. was "completely unresponsive" when he arrived at the hospital in the ambulance. D.M. "was not making effort that was significant to breathe on his own," so Dr. Rodriguez and his team provided breathing assistance. When he examined D.M., Dr. Rodriguez "noted bruises over multiple parts of [D.M.'s] body, both on the front and the back of his body, both on the head and the trunk." He said, "[i]t seemed unlikely to me that walking into a room and collapsing would have resulted in the bruises that I saw." He then ordered a CT scan of D.M.'s head and brain. The CT scan showed "bleeding around the brain and that the brain appeared to be pushed over towards the—towards the patient's right, which is sort of an abnormal position for the brain to be in and was, in my opinion, of direct result of the

blood that was taking up space inside of the skull." Dr. Rodriguez immediately sought to consult with a neurosurgeon and with the intensive care unit at the hospital.

Dr. Price testified that when D.M. arrived at the emergency room, his brain stem was not functioning. She explained that "surgery is futile" when a child's brain stem is not functioning. She also explained that D.M. had a subdural hemorrhage, which is bleeding between the brain and its covering. The hemorrhage created pressure on the brain stem so that the brain stem "stop[ped] working." She conducted the first of two independent tests to determine brain death. She said, "every test I did suggested that the brain stem was not functioning." The second independent test, conducted by the doctors in the intensive care unit, reached the same conclusion. Dr. Price also testified that she observed a skull fracture on D.M.'s CT scan. She was questioned on cross-examination about the possibility that D.M.'s injury took place before the day he was admitted to the hospital. She explained the symptoms a child would exhibit in the course of a "slow brain bleed," such as headache, vomiting, irritability, and lethargy, and said that D.M.'s caregiver did not relate that D.M. showed any of those symptoms. On redirect, she said, "I do not think it happened the day before."

Dr. Cox testified that D.M. had numerous external injuries in addition to his brain injury:

> He had bruising on his forehead, bruising around his eyes, bruising behind the right ear, and on the edge of the left ear. He had some small bruises on his chest wall, and then, when he was rolled, he had multiple bruises on his back. And then, he also had a bruise on the side of his penis.

He explained how a number of these injuries appeared to be inflicted rather than the result of accidents. He reviewed the CT scan. The severity of the injury, combined with D.M.'s unresponsive condition, "was a sign that it ultimately was a fatal injury."

Dr. Cox spoke to appellant but did not receive explanations for D.M.'s severe injuries. He explained that if, as appellant described, D.M. was walking on his own, dancing, swallowing, and other normal activities, then "he didn't have an injury that would ultimately kill him at that

point." Dr. Cox explained, "[w]ith this type of brain injury, [D.M.] would have neurologic symptoms immediately." These symptoms could include a "terrible headache," vomiting, seizure activity, and a "wide range" of other symptoms "from just feeling bad and groggy to sleepy to being comatose."

Fitzpatrick testified she arrived at the emergency room after D.M.'s admission and observed D.M.'s injuries:

> There was a laundry list of injuries, but the ones that I remember specifically were the bruising over, I believe, his right eye, some bruising to his forehead. He had bloodstaining on his teeth, from his lip being busted. He had five large circular bruises in the center of his back. Over his tailbone, he had a contusion and, like, an abrasion with stippling around it, consistent with blunt force trauma. He had a bruise on the center of his chest, and he had kind of a pinpoint bruise on his ear, and then he also had an injury to his penis.

Dr. Cox told Fitzpatrick that D.M. had no brain activity; that "his brain was shifted to one side of his head," and that "it was not likely that he was going to survive."

Fitzpatrick interviewed appellant and established a timeline for D.M.'s behavior and condition during the day, which she summarized:

> So, we have, in that, when we're analyzing that timeline, we have, he's healthy here, healthy all the way up until the nap, healthy when we wake up from the nap, and then at 2:57, we're no longer healthy. So, we have about 57 minutes of unaccounted for time when the child went from being a healthy, normal child, reportedly from the Defendant to a nonresponsive and no longer viable child.

Fitzpatrick explained that obtaining information about D.M.'s activities and behavior when he woke up from his nap at 2:00 p.m. was important "[b]ecause if he had a head . . . injury prior to that time, a head injury that occurred earlier that day or the day before, we would see really extreme signs of lethargy, vomiting, crankiness, [and] fussiness . . . ." She concluded that appellant's explanation of D.M.'s behavior "was not consistent" with D.M.'s injuries.

Dr. Hastings testified that D.M.'s autopsy revealed numerous external injuries:

> So, starting with the head, the child had numerous contusions, which are basically bruises, involving his head, numerous on his eyelids. There were multiple

contusions on his ears, on his face. He also had scattered petechiae[2] on his eyelids, and then going down to his chest, he had scattered contusions and abrasions on his chest as well, numerous contusions on his back, and then a few abrasions on his foot, and then some hemorrhage under one of his toenails as well[.]

Dr. Hastings went on to describe D.M.'s internal injuries. He had "multiple different areas of hemorrhage underneath the scalp"; there were four different sites on the left side of D.M.'s head where Dr. Hastings could see hemorrhaging. "[T]here was a large subdural hemorrhage overlying the left parietal lobe which is basically the left side on the top of the brain," which Dr. Hastings described as "a very large injury that was fatal to the child." There was also hemorrhage in the midbrain and pons.[3] In addition to the brain hemorrhages, Dr. Hastings noted a recent rib fracture on D.M.'s left eighth rib. He also noted, on the same rib, an "old fracture that had healed." He explained that the bruises he observed on D.M.'s back were "all concentrated around the area where the rib was fractured." Dr. Hastings's conclusion was "that the decedent died of blunt force injuries and that it was a homicide."

On cross-examination, Dr. Hastings testified that the autopsy did not reveal either laceration of the liver or a skull fracture. Dr. Cox and Dr. Price had testified that these injuries appeared on a CT scan. Dr. Cox explained he would not be surprised if the medical examiner did not find a liver laceration, because "direct visualization's better than imaging study." Similarly, Dr. Hastings explained that the discrepancy is "just a matter of imaging modality. They saw it on imaging, and it didn't happen to be there."

On redirect examination, Dr. Hastings testified that D.M.'s injuries were consistent with a homicide, not a fall:

---

[2] Dr. Hastings defined "petechiae" for the jury as "little tiny hemorrhages that result from a blood vessel rupturing."

[3] Dr. Hastings explained that "[t]he hemorrhage within the midbrain and pons, which these are parts of the brain stem which are the vital parts of the brain to-do functions, such as breathing. So, when you get hemorrhage within there, the person loses conscious[ness] and stops breathing." Dr. Hastings also testified that "there was retinal hemorrhage, and then, hemorrhage within the optic nerve sheaths as well, which are the nerves that connect the eye to the brain." And "[t]here was hemorrhage within the dorsal root ganglion of the spinal cord which, again, is one of the rootlets or the nerves that takes the information to and from the spinal cord[.]"

Based on the injuries, he has multiple areas of subscalpular hemorrhage which are incompatible with falling down once and getting a hemorrhage—if you did that, you'd have one area of hemorrhage, not four separate areas of hemorrhage—the multiple other contusions all over the body including all over the back, all over the face, the rib fracture, and then the investigative history.

Dr. Quinton supervised D.M.'s autopsy. He testified there were "four or five impact sites" under D.M.'s scalp. He explained that "you wouldn't get five points of impact" from falling backwards and hitting a carpeted floor. He was asked whether D.M.'s normal activity of walking, talking, eating, and dancing during the day was "consistent with the child then all of a sudden dropping at three o'clock with a subdural hemorrhage." He answered, "If you're asking if the subdural was already there, no. It's not consistent with that."

Appellant sought to establish at trial that D.M.'s injuries could have been inflicted at a time when D.M. was not in appellant's care. Through cross-examination of the State's witnesses, appellant sought to prove:

- D.M. had a history of abuse;

- The past abuse occurred at times when appellant was not living in the same household with D.M.;

- D.M. had been in the care of others the day before he was taken to Children's Medical Center; and

- D.M.'s death could have been the result of a "slow bleed" in his brain that began the previous day when D.M. was in the care of others.

During cross-examination of Martinez, D.M.'s mother, appellant sought to establish that D.M. had been at Martinez's grandmother's home and in her care often, in particular on the day before he was taken to the hospital:

Q. As a matter of fact, the day before the 19th, when you were called to go to the hospital[,] on the 18th of November, he had been over there, right?

A. Yes.

Q. He had been over there because—for about three to four hours, correct?

–7–

A.    Yes.

Q.    Okay.  And Michael wasn't there because he had to go [to] some rehab classes; isn't that true?

A.    Yes.

Also during cross-examination of Martinez, appellant sought to establish that D.M. had visible bruises at a time when appellant was not living in the same household.  Martinez admitted that she had posted a picture of D.M. on Facebook on May 26, 2014.  The picture was admitted into evidence and defense counsel questioned Martinez about bruises on D.M.'s neck.  Although Martinez denied there were any bruises visible in the picture, she testified:

Q.    Okay.  Now, May 26, 2014, was Michael Mercado anywhere near you?

A.    No.

Q.    He was in a rehab facility, wasn't he?

A.    Yes.

Q.    That wasn't even in Dallas, correct?

A.    Yes.

Q.    It was out of town, correct?

A.    Yes.

Q.    So, in May of—May 26, 2014, he was nowhere to be found near [D.M.], correct?

A.    Correct.

On redirect examination, counsel for the State attempted to establish the time period in which appellant was living in the same household with D.M.  Martinez testified that she met appellant when D.M. was six months old, and that D.M. died when he was two and one-half years old, but appellant did not live in the same household with them for the entire two-year period:

Q. . . . Was there a period of time where you guys were not in communication with each other?

A. Yes.

Q. And that's because Michael was on probation at that point, right?

A. Yes.

Appellant's counsel objected, stating, "Your Honor, just for the record, I'll object under 404."

The trial court responded:

> THE COURT: Sustained. Your objection is overruled in as much as you previously opened the door with the questioning concerning him being in rehab.
>
> [DEFENSE COUNSEL]: Actually, Your Honor, I just wanted the record to reflect the objection.

Counsel for the State then elicited testimony from Martinez that appellant was on probation for a felony drug charge, and had been ordered to go to a rehabilitation facility called "SAFPF,"[4] where he was "on lockdown." Martinez testified that she was living with appellant's grandfather while appellant was at SAFPF. She explained that although appellant was at SAFPF for almost a year, he came to live with them on his release.

Martinez testified that when appellant came home from SAFPF, he was "required by the Court" to attend classes three days a week for several hours. But appellant lived at home with Martinez and D.M., using Martinez's car to drive to and from the courthouse where the classes were held, and he cared for D.M. when he was not attending the classes.

The jury found appellant guilty of capital murder, and the trial court sentenced him to incarceration for life without the possibility of parole. This appeal followed.

---

[4] "SAFPF" refers to a substance abuse felony punishment facility of the state prison system. *See, e.g., Hill v. State*, No. 05-14-01445-CR, 2016 WL 1554932, at *1 (Tex. App.—Dallas Apr. 14, 2016, no pet.) (mem. op.) (not designated for publication).

## II. Discussion

### A. Admission of Evidence

In his first issue appellant contends the trial court erred by admitting extraneous evidence of his prior felony conviction. The trial court permitted the State to elicit testimony from Martinez about appellant's prior conviction on a felony drug charge, including the information that appellant spent time in "lockdown." Appellant's objection to this line of questioning was overruled by the trial court.

### 1. Applicable Law and Standard of Review

Under rule 404(b) of the Texas Rules of Evidence, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). Rule 404(b) codified the common law principle that a defendant should be tried only for the offense for which he is charged and not for being a criminal generally. *Rogers v. State*, 853 S.W.2d 29, 32 n.3 (Tex. Crim. App. 1993). Under rule 404(b), however, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Rebuttal of a defensive theory is one of the permissible purposes for which relevant evidence may be admitted under rule 404(b), including a theory raised by the testimony of a State's witness during cross-examination. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994) (op. on reh'g).

To preserve error regarding the admission of evidence of other crimes, a defendant must specifically object and obtain a ruling. *Fuller v. State*, 827 S.W.2d 919, 926 (Tex. Crim. App. 1992). It is the trial court's task to determine whether extraneous offense evidence is relevant to

a permissible purpose under rule 404(b). *See Ransom*, 920 S.W.2d at 300. The trial court's ruling is entitled to deference and will be reversed only for abuse of discretion. *Id.*

## 2. Analysis

As shown in the above quotations from the record, the trial court overruled appellant's objection to the admission of evidence regarding appellant's "probation," explaining that appellant had elicited testimony on the subject in his cross-examination of Martinez. The State's redirect examination of Martinez sought to establish a timeline for the periods when appellant was living in the same household as D.M., as well as to establish that appellant and Martinez's relationship was ongoing for all but the first six months of D.M.'s life. The questions established that (1) appellant and Martinez's relationship began before appellant went to SAFPF; (2) during the time appellant was at SAFPF, Martinez and D.M. were living with appellant's grandfather; (3) on appellant's release from treatment, he returned to his grandfather's home to live with Martinez and D.M.; and (4) appellant's release was at least a few months before D.M.'s death. This evidence was directly relevant to appellant's defensive theory that others could have been responsible for D.M.'s injuries and death; specifically, the evidence rebutted appellant's theory that he was not living in D.M.'s home at times when D.M. had been injured.

The State also sought to clarify that although appellant was attending classes in connection with his probation after his return from SAFPF, those classes were for only a few hours three days a week. Regardless of his attendance at the classes, he was living in the same home with D.M. for months before D.M.'s admission to the hospital. Appellant was caring for D.M. except when he attended classes. Because the evidence directly rebutted a defensive theory, it was admissible under rule 404(b). *See Moses*, 105 S.W.3d at 626. We conclude the

–11–

trial court did not err by overruling appellant's objection to the admission of this evidence.[5] We decide appellant's first issue against him.

## B. SUFFICIENCY OF EVIDENCE

In his second issue, appellant asserts that the evidence is legally insufficient to support his conviction for capital murder.

### 1. Applicable Law and Standard of Review

A person commits the offense of capital murder if he intentionally or knowingly causes the death of a child under ten years of age. TEX. PENAL CODE ANN. § 19.03(a)(8).

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (*Jackson v. Virginia* legal-sufficiency standard is only standard that reviewing court should apply in determining whether evidence is sufficient to support each element of criminal offense beyond a reasonable doubt). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all of the evidence when viewed in the light most favorable to the verdict." *Id.* (quoting *Hooper v. State,* 214 S.W.3d 9, 16–17 (Tex. Crim.

---

[5] We also note that the jury was instructed,

> You are instructed that if there is any testimony before you in this case regarding the defendant having committed an offense, if any, other than the offense, if any, alleged in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any was committed, and even then you may only consider the same in determining motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake [or] accident of the defendant, if any, alleged in the indictment in this case, and for no other purpose.

Absent evidence to the contrary we presume the jury followed the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

App. 2007)).  Direct and circumstantial evidence are treated equally.  *Id*.  A case involving injury to or death of a child often depends on circumstantial evidence because there is rarely direct evidence of exactly how the injuries occurred.  *See Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).  The fact finder is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.  *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

**2.  Analysis**

**a.  Evidence offered by the State**

The State offered evidence that:

- D.M. was in the care of appellant, and only appellant, on November 19, 2014, from at least 9:30 a.m. to the time paramedics arrived at approximately 3:00 p.m.;

- When D.M. arrived at the hospital, he exhibited bruises and marks that were not apparent to his mother when she changed his diaper that morning, and his autopsy revealed a recently-broken rib;

- D.M. suffered a massive brain injury;

- D.M.'s autopsy revealed four or five points of impact on his head and multiple areas of hemorrhage;

- The brain injury was not consistent with a fall; and

- D.M. died as a result of the brain injury.

In addition, the medical experts all testified that in their professional opinion, D.M.'s injuries occurred during the period of time he was in appellant's care on November 19, 2014, and not the day before.

**b.  Evidence relied on by appellant**

Appellant argues the evidence raises reasonable doubt that he caused D.M.'s death.  He contends the evidence shows that:

- D.M. was cared for by other family members for several hours the day before his admission to the hospital, and the medical experts could not conclusively rule out

–13–

the possibility that D.M. suffered a "slow bleed" brain hemorrhage caused by injuries predating November 19, 2014;

- The experts disagreed on critical issues and made errors. They disagreed on whether D.M. suffered a skull fracture and whether a mark on D.M.'s buttock was a congenital Mongolian spot or an injury. They initially reported, in error, that D.M. suffered a liver laceration; and

- D.M. suffered "from a long history of injuries" that appellant did not cause. D.M.'s autopsy showed a previously-broken rib; photographs taken on dates when appellant had no access to D.M. showed bruises; and Martinez's testimony denying the prior injuries was not reliable.

We address each of appellant's contentions.

### i. Alternative theory

Appellant relies on the experts' inability to rule out his alternative explanation, i.e., that D.M.'s brain injury occurred before November 19, 2014, at a time when D.M. was not in appellant's care, beginning as a "slow bleed." The experts testified to this point as follows:

- Dr. Rodriguez, the emergency room physician, could not "medically scientifically speaking" rule out a slow bleed, but his experience led him to believe the possibility of D.M.'s brain injury occurring over a period including the previous day "is probably a little bit long."

- Dr. Price, the neurosurgeon, acknowledged on cross-examination that it is "hard to pinpoint and hard to say exactly with any specificity, medically or scientifically, when exactly the injury occurred that caused the bleeding in the brain." But on redirect, she said: "I do not think it happened the day before."

- Fitzpatrick, the State's child abuse expert, conceded it was "medically possible" that D.M.'s injury began as a slow bleed, but "it wouldn't be, in my experience, that a child would go from fine, fine, fine to dead from a slow bleed." She then contradicted her earlier testimony and said that a slow bleed would be "medically impossible," but conceded that she was not a doctor; a doctor might form another opinion; and the jury would have to decide the question.

In addition to these admissions, however, the jury heard testimony from each of the doctors that a child suffering a subdural hemorrhage would exhibit symptoms as the pressure in the skull increased. Those symptoms would include irritability, social isolation, lethargy, vomiting, stumbling, falling, and inappropriate behavior. These symptoms would increase in severity as

–14–

the pressure on the brain increased. But according to appellant, D.M. exhibited none of these symptoms except a failure to finish his breakfast. Dr. Rodriguez testified that even a child as young as D.M. could communicate that his head hurt. Based on the testimony of the doctors who examined and treated D.M. and who conducted his autopsy, the jury could have rejected appellant's defensive theory that D.M.'s fatal injuries were caused by someone else at an earlier time. *See Bearnth*, 361 S.W.3d at 140 (case involving death or injury to child often depends on circumstantial evidence because there is rarely direct evidence of exactly how injuries occurred).

### ii. Disagreement among witnesses

Several of appellant's challenges to the sufficiency of the evidence are matters of witness credibility. Appellant argues the testimony of Dr. Cox and Dr. Price that D.M. had a liver laceration, an injury to his buttock, and a skull fracture was contradicted by Dr. Hastings's findings. Appellant also challenges Martinez's testimony that D.M. did not have bruises on his back when she changed his diaper in the morning of November 19, 2014. Appellant relies on his grandmother's testimony that at the hospital, Martinez told her the bruises on D.M.'s back came from a fall in the bathtub. He also argues that Martinez was "highly evasive" and denied "unequivocal photographic evidence" that contradicted her testimony. The jury, however, was the sole judge of the credibility of these witnesses. *See Isassi*, 330 S.W.3d at 638.

Appellant also contends that the erroneous report of a liver laceration affected police officer Lee's questioning of appellant at the hospital. He cites Lee's statement that D.M.'s organs were "busted up" and Lee's testimony that D.M. had a skull fracture. He argues that Lee tried to force him to account for injuries that did not exist, and as a result, the jury concluded that appellant's explanations lacked credibility. The jury, however, heard testimony and argument about the alleged errors in the medical reports which they could consider in making their credibility determinations. And in any event, it was the State's burden to provide evidence the

–15–

jury found credible to establish the elements of the offense. The jury could have believed the evidence offered by the State to show that appellant intentionally or knowingly caused D.M.'s death, and could have found appellant guilty independent of any conclusions it drew about either Lee's credibility or appellant's.

### iii. History of abuse

As we have explained, the evidence that D.M. died as a result of a massive brain injury was uncontroverted. The evidence that appellant was D.M.'s only caretaker on the day that D.M. became nonresponsive due to that injury was uncontroverted. The State offered expert testimony to establish that the injury was sustained during the time period when only appellant was caring for D.M. Even if we assume that appellant did not cause any of the bruises shown in earlier pictures or D.M.'s previously-broken rib, there is no evidence that these prior injuries or the person who inflicted them contributed in any way to the massive brain injury that caused D.M.'s death.

### c. Conclusion

Examining all the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found the essential elements of the offense of capital murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. We decide appellant's second issue against him.

### III. CONCLUSION

We affirm the trial court's judgment.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE, ASSIGNED

Do Not Publish
TEX. R. APP. P. 47

160152F.U05

–16–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MICHAEL DAVID MERCADO, Appellant

No. 05-16-00152-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1435009-Q.
Opinion delivered by Justice O'Neill;
Justices Lang-Miers and Myers
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 29th day of December, 2016.